FRANK T. WALLACE *et al.*

*v.*

HENRY J. WHITMAN *et al.*

*Opinion filed February 13, 1903.*

1. WILLS—*what does not show want of testamentary capacity.* Evidence that the testator's physical and mental faculties had failed to some extent; that he sometimes failed to recognize slight acquaintances at first sight; that he entertained religious views somewhat peculiar though common to many other people, and that he preferred fasting to medicine for indigestion, does not show want of testamentary capacity, where there is no evidence of any actual occurrence showing such want of capacity.

2. EVIDENCE—*testimony that the testator "acted foolish" is improper.* Testimony of a witness that the testator "acted foolish" when he went about the house should be stricken out, on motion, where the witness states no facts upon which her conclusion is based.

3. SAME—*what testimony improper on issue of testamentary capacity.* A statement by the testator's sister, when asked what she thought of the testator's mental condition from her talks with him, that "me and my sister just talked and had a good cry over it; we seen his mind was gone," should be stricken out, on motion.

4. SAME—*opinions not relevant to the issue are incompetent.* Witnesses who have testified to the mental soundness of the testator should not be compelled, over objection, on cross-examination, to give their opinions as to whether the testator was honest, truthful and wanted to do right, the only purpose of such questions being to raise an inference against the fairness of the will.

APPEAL from the Circuit Court of Warren county; the Hon. JOHN A. GRAY, Judge, presiding.

I. M. KIRKPATRICK, for appellants.

C. H. HARRIS, and GRIER & STEWART, for appellees.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

William H. Whitman, of Warren county, died at the age of seventy-seven years on May 25, 1901, leaving a last will and testament, written by himself, as follows:

"The last will and testament of W. H. Whitman of Coldbrook township, Warren county, Ill. Being of sound mind and memory, do make and publish my last will as follows:

"I give and bequeathe unto my oldest son, F. M. Whitman of Algona, Iowa, one hundred ($100) dollars. I give and bequeathe unto my second son, W. B. Whitman of Camp Clark, Neb., one hundred dollars ($100). I give and bequeathe unto my youngest son, H. J. Whitman of Floyd township, Warren county, Ill., one hundred dollars ($100). I give and bequeathe unto Katie Smith, my grand daughter, all my stoves, stove vessels, dishes and kitchen furniture, but all my beds, bedding, bedsteads, beaurow, safes, chairs, sowing mashine, tables, stands, pictures, picture frames, bookcase, books, papers, pamphlets, and S. C. Adams's chart of history. Also my little farm described as follows: South end of the east half of the southwest quarter of section 9, 11 north, 1 west, 55 acres, lacking 1 rod and six feet wide, 100 and 10 rod long, more or less, or all east of the hedge sold to M. H. Shelton, it was once a road: Situated in Coldbrook Township, Warren County, Ills.

"I will that all be disposed of to the best advantage. Then after all my just debts are paid, and funeral expenses paid off, I give and bequeath *all* to the elders of Talbot Creek church; as a *standing fund*, to be used by them for the spread of Christianity, morality and enterprise in Warren County, Ills., I appoint Frank T. Wallace and Elmer E. Bruington as executors. I annul, revoke and make void all former wills made by me.

"My wife and I had rather our money be spent as above, than at saloons and at billiard tables.

"William and Katie Smith came on my farm of 55 acres the 28th day of May, 1898. It would have sold then for four thousand dollars in cash. For the use of which they *had* agreed to

keep two old persons, treat them as old folks should be treated, pay the taxes and keep the place in good condition.   As they have only kept one person, I give and bequeath the other half to the elders of Talbert Creek church, to go with the *standing fund* already mentioned, and to be used for the same purpose already mentioned.

COLDBROOK, ILLS., *April 10th, 1901.*

W. H. WHITMAN."

The will was executed according to law, and having been duly proved was admitted to probate in the county court of said county.   The testator left his three sons, the appellees, Henry J. Whitman, Francis M. Whitman and Washington B. Whitman, his only heirs-at-law, who filed the bill in this case in the circuit court of said county against the executors named in said will, the elders of said church and Katie Smith, to contest said will. The amended bill charged mental incapacity of the testator and undue influence of C. M. Young, one of the elders of the church.   The amended bill was answered by appellants, said executors and elders, denying incapacity and undue influence, and an issue was made up and submitted to a jury, which failed to agree.   The issue was again tried, when the charge of undue influence was withdrawn by complainants, and at their request the court instructed the jury that a verdict could not be found against the validity of the will on that ground.   The only issue remaining was that of testamentary capacity, and the jury returned a general verdict that the will was not the will of said W. H. Whitman, deceased, and returned with said verdict their findings upon questions of fact submitted to them, as follows:

1.  "At the time of the execution of the writing in controversy, purporting to be his last will, did said William H. Whitman have sufficient mental capacity to recollect the persons or parties who were or might be the natural objects of his bounty?—A. Yes.

2.  "At the time of the execution of the writing in controversy, purporting to be his last will, did said William

H. Whitman have sufficient mental capacity to recollect the property he meant to dispose of?—A. Yes.

3. "At the time of the execution of the writing in controversy, purporting to be his last will, did said William H. Whitman have sufficient mental capacity to transact ordinary business?—A. No.

4. "Did the said William H. Whitman, at the time of the execution of the writing in controversy, purporting to be his last will, have sufficient mental capacity to know and understand the nature of the business in which he was then engaged?—A. No."

The motion of defendants for a new trial was overruled, and a decree was entered setting aside the probate of the will and declaring that it was not the last will and testament of the deceased.

There was not only no evidence tending to prove the charge of undue influence, which was finally withdrawn, but, on the contrary, it was clearly apparent that the will was solely the product of the testator, uninfluenced by any person, and it was in full accord with his character, belief and habits of life. He had lived in Warren county, in a country community, all his life, and resided near the church and was deeply attached to it. His three sons had married and left home more than thirty years prior to his death. They visited and wrote to him but seldom, and there were no strong family ties between them. During all of the time after his children left home until the death of his wife, in the spring of 1898, they lived practically alone on the small farm mentioned in the will, which is worth about $4000 and constituted all of his estate, except some personal property about the house. Shortly before the death of his wife it was agreed that his grand-daughter, Katie Smith, and William Smith, her husband, should move on the farm and have the use of it, for which they were to take care of the old people, pay the taxes and keep the farm in good condition. After the death of the wife Mr. and Mrs. Smith moved on the

place and took care of the testator until his death.  The relations at first seem to have been pleasant and he was grateful for their care, and in the fall of that year, on November 28, 1898, he made a will, by which he gave to his three sons $300 each, and to William and Katie Smith the farm and personal property, and William Smith was named as executor.  The legacies were not charged upon the farm, which constituted substantially all of his property, so that the sons would receive nothing, and they were not considered to a much greater extent than in the later will.  The testator's property was given by that will to the grand-daughter and her husband.  Afterward there was much friction between the testator and Mr. and Mrs. Smith, and their relations became unpleasant. The testator complained that they were in the habit of leaving the place without warning and locking the house, leaving him to take care of himself, and there is some evidence tending to prove the truth of his complaint. He was a very religious man and intolerant of the drinking habit, and Mr. Smith indulged in that habit, although he testified that he did not drink to excess.  The testator frequently stated that he did not want to leave his money to be squandered in saloons and gambling houses, and that his wife, in her lifetime, held the same views.  He had written the first will and expressed his intention of making a new one, and he executed that intention by the will in question.

On the question of testamentary capacity there was a great amount of testimony.  The testator lived in a country neighborhood, and the witnesses included those who were his neighbors and knew him, and also casual acquaintances residing in an adjoining county and who saw him but seldom and knew little about him.  Everything that he had done or said in the later years of his life was brought to light, and about an equal number of witnesses was called on each side.  He had no business except insuring his property in a local mutual insurance

company, and paying the assessments therefor, and the purchase of crackers, tobacco, postal cards and other trifling things at the country store where the post-office was kept. This business he transacted intelligently. He also made arrangements for erecting a tombstone for himself and wife by providing that a note of Elmer Bruington, for $200, on which some small payments had been made, should be used for that purpose, and he prepared an inscription to be put on the tombstone. He set apart the note in trust for that purpose and gave written instructions in reference to it, showing no want of capacity to transact business. He had a very clear memory of former events, and wrote a local history, entitled "The History of the Disciples of Christ from 1831 to 1900," giving the principal events of the period which it purported to cover. He included in it a great many people, with numerous dates and events of interest. He gave copies of this history to witnesses not very long before his death. He was also devoted to music and liked to talk about it, and especially sacred music. He copied songs, which he gave to young ladies to practice, telling them to practice the songs so that they would be ready when wanted, but not indicating the occasion, and they were sung at his funeral. He composed verses to some extent and set them to music, and they were of a character to be expected from a person of his education and situation in life, without any indication of incapacity or mental aberration. After his wife's death he was a very lonely man, and thought and talked a great deal about her and her love and kindness to him. The verses which he wrote related to that subject and his loneliness. The evidence relied upon to show incapacity was such as can generally be produced respecting any person of advanced age, whose physical and mental faculties have failed to some extent from that cause. There was no evidence of any actual occurrence or expression which showed incapacity to transact business or to make a will. The testimony of

a number of witnesses went no further than to show that
they had met him and thought he had failed, and that
he was weak and walked with a cane.   Others who saw
him very infrequently,—perhaps two or three times a
year,—said that he did not recognize them at first or
re-call their names, but when their names were given he
never failed to recollect them and to locate them prop-
erly.   One witness from an adjoining county, who was
about as old as the testator, testified that he came there
and inquired where a person lived, and the testator told
him the first house west of the church, and he found that
the person lived in the third house west of the church,—
three-quarters of a mile from it.   The witness confessed
to a very defective memory and may have misunderstood
the testator, but if he did not, the evidence merely shows
that the testator was mistaken.   Another witness from
Galesburg, in Knox county, who sold tombstones, and
had not seen the testator since before his wife's death,
drove by the farm in June, 1900, and said the testator
did not recognize him, and when told who he was, said
he wanted to buy a monument.   The witness came back
in two or three weeks afterward with his designs, when
the testator told him not to come in; that he had put
his property in the hands of his grand-daughter and
did not have control over it, and would buy a monument
when he got around to it.   He remembered the previous
arrangement with the witness, and went out to see him
about it but would not admit him.   That was after the
first will was made giving the property to the grand-
daughter and her husband, and before the second will,
and the testimony did not show that the testator was
incapable of transacting business but that he refused
to deal with the party, and he provided for the tomb-
stone in another way, as already stated.   Some of the
witnesses thought the testator incapable because he did
not call a doctor to treat him for indigestion.   He ex-
pressed a belief to the effect that fasting was the proper

cure, and that if he was able to fast and abstain from food it would cure him. That belief does not appear to have been irrational and did not furnish evidence of a want of capacity to make a will, since there are many persons of sound mind who entertain the same belief and practice abstinence for the same reason. Some of the witnesses said that the testator had always been somewhat peculiar, and this peculiarity consisted mainly in his talking about the Bible and religion. He was of a deeply religious nature, and while he would talk about current events of the neighborhood he could not be interested in politics at all, and his mind constantly reverted to religious subjects. He studied the Bible and quoted from it a great deal, and believed in a coming millennium. He took great interest in what he called the Jewish movement for the establishment of the Jews in Palestine, and said that the Bible taught that the Jews would return from their wanderings and re-occupy that land; that they were acquiring the wealth of the world, and would accept Christ and devote their great wealth to converting the world, and then there would be a second coming of Christ. He had a historical chart to which he devoted a great deal of study, as well as to the Bible, and he sometimes saw in current events indications of the near fulfillment of his prophecies. His views were practically the same as those of great numbers of christians and of the societies or churches of Adventists. The sanity of people entertaining such religious beliefs has never been questioned nor their ability to make a valid testamentary disposition of their property. There was no substantial evidence of want of testamentary capacity, and the verdict of the jury was clearly against the evidence. We are of the opinion that the issue should be submitted to another jury.

There were some errors in the admission of evidence prejudicial to defendants, which may have contributed to produce the verdict and which it is proper to notice,

as the case will be tried again. One witness was asked how the testator went about the house, and answered that he acted foolish. The court overruled a motion to strike out the answer, and erred therein, since the answer was not a statement of any fact, but a mere conclusion, and the witness had not stated any facts whatever. The witness afterward explained that by acting foolish she merely meant he was impatient, and nothing else. The testator's sister was examined as a witness, and after stating that he had failed, was asked what she thought about his mental condition from her talks with him and what she saw of him. She answered, "Me and my sister just talked and talked and had a good cry over it; we seen his mind was gone." The court refused to strike out the answer, which gave to the complainants the benefit of what the sisters said and the effect of their sorrow and weeping over it. Some of the witnesses for defendants who had testified to facts showing mental soundness and capacity of testator, and had given their opinions to the same effect, were asked, on cross-examination, whether he was truthful, whether he was honest and whether he wanted to do right, and to all these questions objections were made and overruled. The witnesses in this class of cases, after detailing facts tending to prove mental soundness or unsoundness, are permitted to give their opinions, but these questions related to conclusions not relevant to the issue. Their only purpose or effect was to raise an inference against the will, because the jury might conclude that it was not a proper will for him to make.

While the instructions given are subject to some criticism as being argumentative in nature, they are substantially correct statements of the law.

The decree of the circuit court is reversed and the cause is remanded.                    *Reversed and remanded.*