# N. Elizabeth Told, Appellee, v. Madison Building Company, Appellant.

## Gen. No. 24,726.

1. ELEVATORS, § 3*—*when question whether plaintiff, suing for injuries in elevator accident, was rightfully occupying office in defendant's building is for jury.* In an action to recover for personal injuries received in an elevator of defendant's building, where it appears that for more than 4 years plaintiff had occupied a room in an office under an arrangement with the lessee of such office, her name being on the outer door of the suite, such occupancy being open and evident, that she was known to the superintendent of the building, the engineer, the elevator starter, the operator of the elevator in which she was injured and the janitor, and there is no evidence that defendant ever made any objections to such occupancy, though the lease of such office provided that the tenant was not to sublet and was not to permit the use of the premises by any others than himself, his agents and servants, the question whether she was rightfully occupying such office and with defendant's implied consent is for the jury.

2. ELEVATORS, § 3*—*when evidence tends to show that plaintiff, suing for injuries in elevator accident, was rightfully on elevator as passenger.* In an action to recover for personal injuries received from an elevator in defendant's building, evidence that plaintiff entered the elevator, while it was standing open to receive passengers, for the purpose of being carried up to an office in defendant's building in which she had sublet and occupied space openly for more than 4 years without interference by defendant, tends to show that she was rightfully on the elevator as a passenger, notwithstanding the lease of the tenant from whom she sublet prohibited him from subletting or from permitting the occupancy of such office by others than himself, his agents and servants.

3. ELEVATORS, § 2*—*what degree of care and diligence in operation required as to passenger.* The owner of a building operating elevators for the use of passengers is required to exercise at least a high degree of care and diligence not to injure a passenger rightfully using the elevator.

4. ELEVATORS, § 23*—*when allegations in declaration in action for injuries in elevator accident are sufficient after verdict.* In an

---

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

action tó recover for personal injuries received by one in entering a passenger elevator in defendant's building for the purpose of being carried to the office in which she occupied space, the allegation of defendant's ownership of the elevator, its negligent operation thereof and the injuries resulting to plaintiff therefrom, and of plaintiff's exercise of care, *held* sufficient, after verdict, to support a judgment in plaintiff's favor.

5. Limitation of Actions, § 68*—*when amendments to declaration in action for injuries in elevator accident do not state new and different cause of action.* In an action to recover for personal injuries received in using a passenger elevator in defendant's building, an amendment which substitutes the allegation that plaintiff had an "arrangement or agreement with a tenant of said building" whereby she was permitted and entitled to occupy an office in the space leased by the tenant, for the allegation that plaintiff was a "tenant in said building," and an amendment adding a statement as to her falling down the elevator shaft to the allegation of her being crushed between the elevator and gates and "some part of the structure adjacent thereto," do not state a new and different cause of action falling within the bar of the statute of limitations.

6. Elevators, § 29*—*when verdict for plaintiff, suing for injuries in elevator accident, is not manifestly against weight of evidence.* In an action to recover for personal injuries received in a passenger elevator in defendant's building, *held* that a verdict for plaintiff was not manifestly against the weight of the evidence.

7. Evidence, § 444*—*when testimony of medical witness is error because based on subjective symptoms.* In an action to recover for personal injuries, it is error to permit a medical witness for plaintiff, not testifying to the result of examination of plaintiff for treatment, to express an opinion as to plaintiff's future condition, based on periods of noncomprehension and mental dullness on the part of plaintiff after the beginning of the action, they being subjective symptoms which could have been purely voluntary and under plaintiff's control.

8. Evidence, § 175*—*when declarations of injured party are competent.* Declarations of the injured party are only competent when made as a part of the *res gestœ*, or to a physician during treatment, or upon an examination prior to and without reference to the bringing of an action to recover damages for the injury complained of, unless the examination should be made at the instance of the defendant with a view to trial, and they should be free from all suspicion of being made with reference to future litigation.

---

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

9. EVIDENCE, § 448*—*when testimony of medical expert should be stricken.* In an action to recover for personal injuries, testimony of an expert medical witness for plaintiff with regard to whether or not epilepsy will follow as a result of the injury should be stricken out as speculative, where such testimony shows that there is not, in his opinion, "a reasonable certainty" that epilepsy will develop, but only that it is probable.

10. EVIDENCE, § 398*—*what expert witnesses may testify to.* Expert witnesses may testify or give their opinions only as to future consequences that are shown to be reasonably certain to occur.

11. APPEAL AND ERROR, § 1772*—*when error requires reversal.* The rule that whenever error is shown to exist, it will compel a reversal unless the record shows affirmatively that the error was not prejudicial, applied as compelling the reversal of a judgment for plaintiff, in an action to recover for personal injuries in which an expert witness for plaintiff was permitted, over objection, to testify, in substance, that it was probable that epilepsy would result from the injuries, and which evidence was strongly emphasized by plaintiff's counsel in his argument.

Appeal from the Circuit Court of Cook county; the Hon. OSCAR M. TORRISON, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1918. Reversed and remanded. Opinion filed December 2, 1919.

**Statement of the Case.** This is an appeal from a judgment of $20,000, rendered March 9, 1918, after verdict, in the Circuit Court of Cook county, against the defendant, Madison Building Company. The action is for damages for personal injuries to plaintiff received in an elevator accident on the morning of October 24, 1914, on the first floor of the Chicago Savings Bank Building, situated at the southwest corner of State and Madison streets in the City of Chicago.

The entrance doors to the building were on the south side of Madison street, and about 30 feet south thereof was a bank of four elevators. The elevator corridor, 5 feet 6 inches wide and about 43 feet long, running east and west in front of the elevators, was connected

with said entrance by a lobby about 16 feet wide and 24 feet long. To the west of said entrance and lobby was a jewelry store, and to the east was a cigar store, south of which was a stairway leading to a bank on the second floor. To the east of said elevator corridor was a door leading into a drug store. Plaintiff was injured in connection with No. 4 elevator, the most westerly of the bank of elevators, and this elevator was to the rear of the jewelry store. Between No. 3 and No. 4 elevators was a marble pillar, extending north into said elevator corridor 4½ inches from the grille work of the elevator shaft. Attached to the grille work, in front of the elevator car, were two elevator gates. These operated from each side and in unison by means of a gate accordion at the top, a contrivance, made up of pieces of metal arranged in accordion fashion, that caused both gates to move on force being applied to one of them. The gates when closed were locked by a latch controlled by the elevator operator.

Plaintiff was about 28 years of age at the time of the accident. She was a regularly licensed physician, having graduated from the Chicago College of Medicine and Surgery in the year 1909. She first commenced to practice her profession in June, 1910, in the Chicago Savings Bank Building. She then made an arrangement with Dr. George E. Taylor, a dentist and a tenant in said building on the ninth floor, whereby she rented from him the privilege of occupying a private office, with use of reception room, telephone service, etc., for 2 hours every afternoon, for the monthly consideration of $15, to be paid Dr. Taylor, and she had her name on the entrance door to said suite of offices. This arrangement had continued for more than 4 years down to the time of the accident, supplemented by an additional arrangement made in August, 1914, whereby she could occupy the same quarters for 2 hours every morning only for appointments, and this latter ar-

rangement was in force on the day of the accident. Plaintiff was known by all of defendant's employees who testified, including the superintendent of the building and the elevator starter. She had no lease from the defendant. The lease from the defendant to Dr. Taylor was introduced in evidence by defendant. It is a lease to a portion of rooms 902 to 905, inclusive, from May 1, 1911, to April 30, 1916, and it is provided therein "that the lessee will use and occupy said premises for a dentist's office and for no other use and purpose," and that the lessee "will not sublet said premises, or any part thereof, and will not permit the use of said premises by any other parties than the lessee, and the agents and servants of the lessee." It is further provided in clause 10 of the lease that in case the lessee shall make any default in respect to any of the covenants, then the lessor may at its option at once and without notice terminate the lease.

The testimony of the occurrence, witnesses called on behalf of plaintiff, and those called on behalf of defendant, as to how the accident happened, is very conflicting. Plaintiff testified, in substance, that she entered the elevator corridor from the drug store, accompanied by her cousin, Mrs. Mabel Lyle; that she was in a hurry to get to her office, where she had an appointment with a patient; that she was walking ahead of Mrs. Lyle and carrying an umbrella in her right hand; that she walked west and passed Mr. Flynn, the elevator starter, who was standing in front of elevator No. 3, talking to some one; that when she got in front of elevator No. 4, it was down and the gates were wide open, with the operator standing in his usual position in the northeast corner of the elevator car, facing north; that just as she was in the act of stepping into the elevator, and had her right foot resting on the floor of the car, and was just lifting her left foot off the floor of the building outside the car,

the car started with a jerk; that the next thing she knew she received a blow on the head and she felt "just sort of crushed down"; that until her head struck something she was standing erect, facing south; that then she tried unsuccessfully to clutch something, fell, struck something, and then knew she was in the elevator pit; and that she did not get into the elevator and turn around, facing the gate, before the elevator car started upwards. Raymond S. Lyle testified, in substance, that, having an appointment to meet his wife, Mabel Lyle, he came in the Madison street entrance of the building about 10 minutes of 11 o'clock and stood waiting on the second step of the stairway leading up to the bank; that he saw his wife come into the elevator corridor by way of the drug store, but that he did not see plaintiff; that just about the time he saw his wife, he was attracted by a noise in No. 4 elevator, and he looked and saw a woman fall out of the elevator and down into the elevator pit; that the elevator was coming down when he first noticed it and then it went up, and that at the time he saw the woman falling it had the motion of coming down; that the gates were open; and that "it was all in a flash  *  *  * just a bundle of clothes of a woman." Mrs. Mabel Lyle testified, in substance, that, while plaintiff and she were walking west in the elevator corridor, plaintiff being ahead of her and the witness being about in front of No. 3 elevator, she first saw her husband standing on the steps and she stopped for a moment; that then she turned to speak to plaintiff and saw plaintiff about to enter No. 4 elevator, the gates of which were open, and plaintiff was carrying an umbrella in her right hand by the handle; that she could see the full width of said elevator; that she was a foot or two north of the grille work of the elevators, and the pillar between No. 3 and No. 4 elevator did not obstruct the view; that she saw plaintiff get her

right foot on the elevator and was about to lift her left foot when the elevator car started upwards with the gates open, and plaintiff was crushed against the iron grating above the elevator door; that then the elevator came down a little bit, just enough to loosen plaintiff, and she fell into the elevator pit; that from the time plaintiff started to get into the elevator down to the time she fell the gates were not closed at any time; that she doesn't remember if plaintiff came in contact with the gates, or if she struck the floor of the building as she fell, and that she "was all huddled up when she fell."

On behalf of the defendant, Jordan, the operator of No. 4 elevator, testified in substance that prior to the accident said elevator and the gates in front of it on the first floor were working all right; that he first saw plaintiff about 4 or 5 feet east of the elevator, walking west; that the elevator was standing still at that time with the gates wide open; that plaintiff stepped into the elevator, turned around and faced north, taking a position a little to the west of the center and within about 2 feet of the front of the elevator; that he got the bell to start, shut the gates, put his hand over the lock and started; that plaintiff was the only passenger in the elevator; that the next thing he heard was a rattling of the gates and a scream, and he pulled the lever to a stop position, and at the same time looked and saw plaintiff "in a stooping over position and apparently pulling at her umbrella, and almost at the same instant her head struck the accordion, and that sprang the gates open wider, and she rolled out head first"; that the car traveled about a foot after she rolled out; that when he saw her head strike the accordion, the gates were then a couple of inches apart and the striking of the accordion opened them further; that he brought the car to the level of the first floor, felt kind of faint, stepped out and leaned against the

wall of the jewelry store; and that as he stepped out he noticed an umbrella lying on the floor of the car, the "walking point" of which seemed to be bent. Flynn, the elevator starter, testified in substance that he was standing in front of the marble pillar when plaintiff passed him, walking west; that he did not see her enter the elevator; that he heard the bell ring to start the elevator, looked, saw the operator close the gates, and saw plaintiff standing inside the car facing north; that he took a step to the right, heard a rattling of the gates, looked around, saw plaintiff bent over and pressing towards the gates, and then roll out, down into the pit; that when the operator stepped out of the car he noticed an umbrella lying in the center of the car, with the point towards the front of the elevator and bent on the end, but that he did not pick it up; and that he tried to close the gates, but one was bent at the top and bulged out, and the gates could not be closed further than 2 or 3 feet apart. Morrison, the engineer of the building, also testified that a few minutes after the accident he found the rollers of the west gate were off the track and the gate was bulging out at the top. Halecik, a janitor in the building, testified in substance that he was at work, mopping, a little north of the corner formed by the east and south wall of the jewelry store; that he saw plaintiff enter the elevator and later heard the gates close; that then he heard a scream, looked up, saw the gates were open, and saw plaintiff, her face in front, fall down, bent over, into the pit. Peterson, a chauffeur, testified in substance that he was leaning against the south wall of the jewelry store, facing south; that Flynn, the starter, was standing near the marble pillar; that he saw a woman pass between him and Flynn and get into the elevator and turn around; that then he heard a bell and the doors slam, and then a scream, and, glancing up, saw the doors coming open and this woman coming

out, doubled up, and she turned right under the elevator and went down the shaft, her heels hitting the floor as she fell.

Baker, superintendent of the building, testified that, after plaintiff had been taken out of the pit, he got down in the pit and picked up plaintiff's hat, a bag and a comb; and that after the elevator had been run down into the basement by Flynn, the starter, he (Baker) picked up an umbrella from the floor of the car, and gave it, together with the other three articles, to the ambulance police officers. Plaintiff's witness, Elizabeth Wellhaven, testified that Flynn gave her an umbrella which she in turn gave to Mrs. Lyle. An umbrella was offered in evidence, and is attached to the record as an exhibit, the point of which umbrella does not appear to be or have been bent. Mrs. Lyle testified that said umbrella was the one which plaintiff was carrying at the time of the accident and that it is apparently in the same condition as when she received it.

Plaintiff sustained serious injuries. Among them were a fracture of the skull, a fracture of the right leg about the shoe top which caused some inversion of the foot, a fracture of the ischium, a serious wound in the right leg near the crotch which was infected for a time, and a V-shaped wound over her forehead extending from the left eye. It is contended by defendant's counsel that this last-mentioned wound is corroborative of defendant's witnesses as to her position in the elevator when the car started upwards; that she could not have received such a wound had she been entering the car and facing south when the car started, immediately after which her head came in contact with something above; but that, if she was facing the gates when the car started and came in contact with the top of the accordion she could have received such a shaped wound at the point she did. Shortly after the accident she was conveyed by ambulance to the Henrotin hos-

pital, where she remained for 13 weeks, about 8 weeks of which time she was in a plaster cast, the same being applied about 6 days after the accident, extending from the arm pits downward embracing the whole body except the left leg below the knee. Following the injuries she developed nephritis and cystitis, which had improved. At the time of the trial she was able to walk on a smooth surface without the use of a cane. She testified she was then unable to run and was still suffering from various nervous conditions which affected her strength and vitality and her earning power. She also testified she still had severe headaches and still had pain in the right hip if subjected to a jar or jolt. In July, 1915, she resumed the practice of her profession in the Marshall Field Annex Building, coming down a couple of days each week at first and "gradually increasing" and coming down as often as she "felt like it and the girl had any appointments" for her. She also testified that at the time of the accident she was earning from her practice about $4,000 per year; that after the accident she earned, first, about $100 per month, and at the time of the trial was averaging about $200 per month; that these figures were given from memory as she did not keep a record of the number of patients receiving attention from her, and did not keep books as she did not do a credit business as a rule.

Dr. Albert Heym, a witness for plaintiff, testified in substance on direct examination that he had been a practicing physician in Chicago for 20 years—specializing in nervous diseases during all of that time; that he first met Dr. Told, the plaintiff, about 10 years prior to the trial when she was a pupil of his in the Chicago College of Medicine and Surgery; that he always took a great interest in her; that before the accident her health was excellent and her nervous system appeared normal; that he saw her the day after the accident, in

October, 1914, and many times thereafter at the Henrotin hospital but not as her attending physician; that after she left the hospital he did not see her for "quite a time"; that in July, 1915, she called at his offices in the Marshall Field Annex Building and requested that she be allowed to have a room in the suite wherein she could practice her profession and that he granted her request; that he began to advise with her generally as to her condition in July, 1915; that he examined her in his office several times, the last time a few days before the trial (February 18, 1918); and that since July, 1915, "I have seen her practically every day, and I was surprised at how her whole mentality, and —." Defendant's attorney here objected to the witness giving any subjective symptoms after the commencement of the suit (June 15, 1915), and gave his reasons for the objection, which objection was overruled except as to the last examination made a few days before the trial, and defendant's attorney asked that his objection as to subjective symptoms apply to all examinations made after the commencement of the suit. The witness then testified:

"I would like to state here that my findings are objective, not subjective at all. * * * I will not state anything that Dr. Told told me; only what I have observed myself. * * * I observed her appearance; I saw her every day. The way the patient appears to the physician, that is objective; *but we have to state the subjective symptoms,* otherwise we couldn't state any insane condition. * * * As I observed her, Dr. Told had a period of being perfectly different, so far as her personality is concerned. Before, she was a very bright girl, very quick; comprehending very quickly; and she had times or periods every two or three weeks, sometimes nearer and sometimes later, when she was perfectly different; when she didn't understand which way she was, hardly, at all, and —

"Mr. Kirkland: I object and move to strike the answer out.

"Mr. Hussey: The comparison may go out. Doctor, please don't compare the condition afterward with what it was before; * * * but tell us how it has been since.

"Witness: Very well; she had periods of being mentally dull; exhaustion; very weak; *not comprehending quick*, mentally slow! This period would last a few days; she was extremely tired; extremely exhausted; she was morose, in every respect. That period would last a few days, and then it went away, and then she was perfectly normal again, until a spell of that kind came up again. That I observed, objectively, many times, * * *."

After further testimony relating to certain objective symptoms observed during the witness' last examination, a few days before the trial, and on another examination, the following occurred:

"Mr. Hussey: Taking into consideration all of these findings that you have given us, including all of the eye symptoms, and the reflex conditions, and all that you have seen objectively about Dr. Told, what is your prognosis, what is your opinion as to whether it is permanent or not?

"Mr. Kirkland: I make the same objection that I made to the questions at the start; that it is based partly on subjective symptoms.

"Mr. Hussey: I understand he is confining it to objective symptoms.

"Witness: To objective symptoms only.

"Mr. Kirkland: Well, you know, and I know that when you said she cannot comprehend, that that is a subjective symptom.

"Witness: That is objective, that is not subjective, at all; that is objective.

"Mr. Hussey: What is your prognosis? A. The prognosis is extremely poor. Q. Have you an opinion as to whether she will recover sufficiently to be normal? If you have, what is your opinion?

"Mr. Kirkland: The same objection for the same reasons; it is based upon subjective symptoms.

"A. I have an opinion. Q. What is it, doctor? A. My opinion is that she will not be entirely normal. On the contrary, because of the injury to the brain, there is a great danger that some special condition *might develop*.

"Mr. Kirkland: I move to strike the answer out as speculative.

"The Court: That 'on the contrary there is danger,' etc., may be stricken out.

"Q. All right, doctor, is there a reasonable certainty or probability? That is, can you give your prognosis with a degree of reasonable certainty as to the future? A. Yes, I can. Q. What is it doctor?

"Mr. Kirkland: I object, * * *.

"The Court: The objection is overruled. But don't speculate, doctor.

"Witness: No, I don't speculate. When I saw that periodicity of her condition, that she at intervals has these spells of being different—this periodicity *points in the direction of* an epileptic condition. It does, and that's the danger.

" (On defendant's motion that it 'points in the direction of an epileptic condition,' stricken out.)

"Q. Is there a reasonable certainty of that? A. Yes. Q. That is of epilepsy?

"Mr. Kirkland: I object to that; the epilepsy was stricken out of the record.

"Q. What is there a reasonable certainty of? A. That that condition *might develop* into an epileptic condition.

" (On motion of defendant stricken out.)

"Q. I want to put the question this way: You say that there is a reasonable certainty in your prognosis? A. Yes, sir. Q. Of what occurring, with reasonable certainty? A. That epilepsy *will* develop."

Cross-examination by Mr. Kirkland.

"Q. You mean it 'might' develop, don't you? A. The certainty is it will develop. Q. You have seen

lots of people have the same condition that she is in, and they never have epilepsy, haven't you? A. *We can't look into the future.*

"Mr. Kirkland: That's it exactly; so I move to strike the answer out. (Overruled.)

"Witness: As to my answer that I can't look into the future, and for that reason I cannot say whether she will have epilepsy, her present condition makes it *extremely probable* that she will finally suffer from epilepsy. Q. Extremely probable? A. Yes, *that's all we can say; nobody can see into the future and tell what will happen.*

"Mr. Kirkland: Certainly not; and for that reason I move to strike the answer out. (Overruled.)"

The witness further testified on cross-examination:

"I have seen patients who have these periods of what I call 'noncomprehending,' and when they are morose, who live for a great many years and do not have epilepsy. * * * During this period of non-comprehending she could not go right on taking care of her patients; she had to go home and rest. * * * I never saw her at her home. * * * Whether the noncomprehending period lasted more than the 15 or 20 minutes that I was with her, I don't know of my own personal knowledge. * * * This inability to comprehend is something the patient cannot feign, not for any length of time, when under observation by an expert, like me. * * * There is nothing so hard to simulate as insanity, or impaired mentality. * * * Patients simulate epileptic seizures, but that is easy to find out, whether they have the spells or not. * * * She did not improve under my directions. * * * I gave her general advice as to what she should do. I didn't give her any treatment at all."

During plaintiff's attorney's argument to the jury, he said:

"What else has the future in store for Elizabeth Told? Don't forget, when you go into your jury room, the testimony of the doctors; the testimony of the orthopedic man from Vienna, * * *; and this great

neurologist expert tells you   *   *   *   that with 'extreme probability'—that's his words—and with 'reasonable certainty,' she faces epilepsy, and—"

Here defendant's attorney objected to the statement that the witness had used the expression "with reasonable certainty," and an argument ensued as to whether the doctor had used one or the other of the expressions, or both.

Mr. Hussey: (continuing)

"We will say 'extreme probability,' then, if it suits Mr. Kirkland any better; he admits he said that. *   *   *   I am not going to paint epilepsy.   *   *   *   I am going to draw a curtain over it, right here.   You know what epilepsy is; it is common knowledge of all of us.   But I want to ask you one question; when you go into your jury room—If Elizabeth Told, regardless of the fractures, regardless of ability or inability to have children, regardless of the anæmia, regardless of the pain and suffering shooting down her leg, regardless of the intense headaches three or four times a week, regardless of all else,—I ask you to answer me this question: If, regardless of all these things, she faces epilepsy, with 'extreme probability' even, what is it worth?   That's the question I want you to answer: What is it worth?"

Plaintiff's original declaration consisted of seven counts.   In the first three counts it was alleged that plaintiff "was then and there a tenant in said building," and in the last four counts it is alleged that plaintiff "rented certain office space in defendant's building."   In the first three counts it is charged in substance that, while plaintiff was entering the elevator, intending to become a passenger thereon and exercising due care, etc., the defendant negligently caused the elevator to be suddenly started before the gates were closed.   The gist of the last four counts, in varying language, is that, while she was entering the elevator for the purpose of becoming a passenger

thereon, the defendant negligently started the elevator, suddenly, or without warning, or before she had got safely thereon. In all of the counts it is alleged that she was crushed between said elevator and gates and some parts of the structure adjacent thereto, and she was thereby injured, etc. To all of these counts the defendant pleaded the general issue. On October 21, 1916, not quite 2 years after the accident, plaintiff filed an additional count by leave of court. In this count it is alleged in substance that on October 24, 1914, defendant owned and controlled the building and therein operated certain elevators "for the use of tenants in said building and others who might lawfully use the same"; that one of the elevators and the gates and walls or pillars inclosing the same were so constructed and placed that the operator, while standing in his usual position, was unable to see the approach of people intending to enter said elevator until about ready to enter; that, on the day aforesaid, while plaintiff was exercising ordinary care, etc., and was in the act of entering said elevator to ride as a passenger thereon, defendant negligently failed to keep a proper lookout or to warn passengers about to enter the elevator of the starting thereof, whereby plaintiff was thrown or caused to fall upon and against said elevator and some parts of the structure adjacent thereto, and she was crushed, etc., and injured, etc. Subsequently it was ordered that defendant's plea of the general issue theretofore filed stand as a plead to said additional count. Subsequently defendant filed special pleas, as to the fourth, fifth, sixth and seventh counts, that plaintiff did not rent an office in defendant's building; and, as to the first to the seventh counts, inclusive, that plaintiff was not a tenant in said building. On February 13, 1918, plaintiff, by leave of court, amended the 1st, 2nd and 3rd counts, by striking out the words that plaintiff "was then and there a tenant

in said building," and inserting in lieu thereof that "she had a certain contract, arrangement, or agreement with a certain tenant of the said building, to wit, George E. Taylor, whereby she was entitled and permitted to occupy and use, at stated periods, an office and office facilities in the space leased by said tenant from the defendant," etc. And plaintiff also amended all of the counts, including said additional count, so that, after the statements therein that plaintiff was "crushed," etc., there was added to each count the words that "she fell and was caused to fall from said elevator down the shaft thereof a great distance, to wit, 30 feet, striking forcibly and violently upon and against parts of the structure adjacent thereto, and down and upon the floor of said elevator shaft or pit." To all eight counts as so amended the defendant filed (1) a plea of the general issue; (2) a special plea denying that plaintiff was a tenant in said building, or had rented certain office space therein, or was lawfully using and occupying a certain space therein, or that under the contract, arrangement or agreement mentioned in the amendment she was entitled and permitted to occupy and use an office and office facilities in said building; and (3) a plea of the statute of limitations of 2 years. To this last-mentioned plea plaintiff demurred, and, the court sustaining the demurrer, defendant elected to stand by its said plea; and plaintiff elected to join issue with the other pleas filed.

At the close of plaintiff's evidence, and again at the close of all the evidence, defendant moved for a directed verdict in its favor, which motions were denied. The jury returned a verdict finding the defendant guilty and assessing plaintiff's damages at $20,000. Motions for a new trial and in arrest of judgment were overruled, and the judgment appealed from was entered.

SHEPARD, McCORMICK, KIRKLAND, PATTERSON & FLEMING, for appellant; WEYMOUTH KIRKLAND, of counsel.

DONALD R. RICHBERG and FRANKLIN B. HUSSEY, for appellee.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

It is first contended by defendant's counsel that the trial court erred in not directing a verdict for defendant. The argument is, as we understand it, that Dr. George E. Taylor was a tenant of defendant under written lease to a portion of a suite of rooms on the ninth floor of the building to be occupied as a dentist's office; that by the express terms of the lease he was not to sublet the premises or any part thereof, and was not to permit the use of the premises by any others than himself, his agents and servants; that in violation of the terms of the lease, Dr. Taylor made an arrangement with plaintiff whereby he either subleased to her, or permitted her to use and occupy at certain stated times each day, a portion of said premises wherein she could practice her profession; that under these circumstances plaintiff, not being a tenant of defendant and not coming into the building by defendant's invitation, express or implied, but occupying space in the building wrongfully and in direct opposition to the expressed desires of defendant, was no more than a mere licensee, and defendant owed her no duty other than not to wantonly or wilfully injure her; that under all counts of plaintiff's declaration a recovery was not sought on the theory that she was a licensee but on the theory that defendant owed her the duty to exercise ordinary care for her safety; that the proof did not establish any wanton or wilful injury; and that, hence, under the pleadings as well as the proof plaintiff had

not made out a case. We cannot agree with all of the argument or with the conclusion of counsel. We think that the evidence tended to show that defendant, at the time of the accident and prior thereto, knew that plaintiff was occupying an office in the building and had impliedly consented to such occupancy. She made her first arrangement with Dr. Taylor in June, 1910. Her name was then placed on the outer door of said suite of offices, where it had remained for more than 4 years up to the time of the accident. She was known to the superintendent of the building, the engineer, the elevator starter, the operator of the elevator, in whose car the accident occurred, and a janitor of the building, and plaintiff's occupancy was open and evident. For aught that appears to the contrary, defendant made no objections to such occupancy during all of the period. By the terms of Dr. Taylor's lease such occupancy was a technical violation of a covenant of the lease, and defendant, if it had objections, could have taken advantage of clause 10 of said lease which provided for the termination of the lease at defendant's option, in case of default in respect to any of the covenants, but defendant did not do this. We think it was for the jury to say, under all the circumstances in evidence, whether plaintiff was rightfully occupying her office and with the implied assent of the defendant. (*Reynolds v. John Brod Chemical Co.*, 192 Ill. App. 157; *Illinois Cent. R. Co. v. Hopkins*, 200 Ill. 122; *Purtell v. Philadelphia & R. Coal & Iron Co.*, 256 Ill. 110; *Peaks v. Cobb*, 197 Mass. 554.) Furthermore, we think that the evidence tended to show that plaintiff was rightfully on the elevator as a passenger, and defendant in such case was required to exercise at least a high degree of care and diligence not to injure her. (*Springer v. Ford*, 189 Ill. 430; *Steiskal v. Marshall Field & Co.*, 238 Ill. 92.) And we think that the additional count as amended, if not the other counts

as amended, was sufficient after verdict to support a judgment in plaintiff's favor. (*Steiskal v. Marshall Field & Co., supra.* )

It is next contended that the trial court erred in sustaining plaintiff's demurrer to defendant's plea of the statute of limitations to the amendment to the first three counts of the declaration, and to the amendment to all counts thereof, all of which amendments were filed in February, 1918, more than 2 years after the accident. It is urged that a new and different cause of action was stated. We do not think so. As to the amendment to the first three counts, the change from the allegation that plaintiff was a ''tenant in said building'' to that plaintiff had an ''arrangement or agreement with a tenant of said building,'' whereby she was entitled and permitted to occupy and use an office in the space leased by said tenant, does not seem to us to be altogether new and different. In the general use of the term, ''tenant,'' she could be considered as a tenant in the building under the language of the amendment. As to the amendment to all counts, by adding the statement as to her falling down the elevator shaft to the allegation of her being crushed between the elevator and gates and ''some part of the structure adjacent thereto,'' we think this is merely a restatement of the same cause of action, and is not open to the defense of the statute. (*Devaney v. Otis Elevator Co.,* 251 Ill. 28.)

It is further contended that the verdict is against the manifest weight of the evidence. It is strenuously argued that the physical facts and the clear weight of the testimony show that the accident could not have occurred as claimed by plaintiff, that when the elevator car started the gates were closed, that the defendant was not negligent, that plaintiff evidently moved too close to the gates so as to permit her umbrella to get caught when the elevator started to ascend, and

that her negligence was the proximate cause of her injuries. After a careful consideration of all the evidence we are unable to say that the verdict is manifestly against the weight of the evidence.

It is further contended that the trial court erred in admitting certain testimony of plaintiff's expert witness, Dr. Heym, in that (1) he was allowed over objection to express an opinion as to plaintiff's future condition, which opinion was based partly on subjective symptoms occurring in examinations made by him after the beginning of the suit; and (2) was allowed over objection to state that it was "extremely probable" that she would finally suffer from epilepsy, which statement was speculative and incompetent, and was clearly prejudicial to defendant because of the reference made to it by plaintiff's attorney in his argument to the jury. Appropriate motions were made by defendant's attorney to strike out said testimony, but the motions were denied. What was said during the examination of the witness and during the argument of plaintiff's attorney to the jury is set forth above in the statement of the case. We think the trial court erred in both particulars as claimed by defendant's counsel. As it seems to us, periods of 15 or 20 minutes of "not comprehending," being "mentally dull," etc., on the part of plaintiff, are subjective symptoms, notwithstanding the expressed opinion of the witness to the contrary. They "could have been purely voluntary and under the control of the injured party." (*Greinke v. Chicago City R. Co.*, 234 Ill. 564, 573.) And these periods were *after* the beginning of the suit. Declarations of the injured party "are only competent when made as a part of the *res gestæ,* or to a physician during treatment, or upon an examination prior to and without reference to the bringing of an action to recover damages for the injury complained of, unless the examination should be made at the instance of

the defendant, with a view to the trial." (*West Chicago St. R. Co. v. Carr*, 170 Ill. 478, 483; *Chicago Union Traction Co. v. Giese*, 229 Ill. 260, 266; *Greinke v. Chicago City Ry. Co.*, 234 Ill. 564, 570.) And they should be free "from all suspicion of being spoken with reference to future litigation." (*Illinois Cent. R. Co. v. Sutton*, 42 Ill. 438, 440.) And the same rule has been applied to certain outward manifestations within the injured party's control. (*Greinke v. Chicago City Ry. Co.*, 234 Ill. 564, 572.) Furthermore, that the examinations of plaintiff by the witness were made for the *treatment* of her is negatived, for the witness testified: "I gave her general advice as to what she should do. I didn't give her any treatment at all."

As to the second point urged relative to the testimony of the witness, it appears that he stated on direct examination that "there is great danger that some special condition *might* develop," then, that "this periodicity *points in the direction of* an epileptic condition," then, that there is a reasonable certainty "that that condition *might* develop into an epileptic condition," all of which statements were striken out, and we think properly. Then the witness finally said, on direct examination, that there is a "reasonable certainty" that "epilepsy *will* develop." Then, on cross-examination, he stated "we can't look into the future"; (motion to strike the previous answer overruled) then he stated "I can't look into the future, and for that reason cannot say whether she will have epilepsy; her present condition makes it *extremely probable* that she will finally suffer from epilepsy;  *  *  *  that's all we can say; *nobody can see into the future and tell what will happen.*" (Motion to strike said previous answer out again overruled.) We think that the entire testimony of the witness showed that there was not, in his opinion, a "reasonable certainty" that

epilepsy would develop, but only that it was probable. It is true the witness said "extremely probable," but that statement was immediately thereafter qualified. And we think that the testimony was speculative and incompetent, and that the court should have granted defendant's motions to strike. "Expert witnesses can only testify or give their opinion as to future consequences that are shown to be reasonably certain to follow." (*Fellows-Kimbrough v. Chicago City Ry. Co.*, 272 Ill. 71, 76.) See also *Lauth v. Chicago Union Traction Co.*, 244 Ill. 244, 251; *Lyons v. Chicago City Ry. Co.*, 258 Ill. 75, 82; *Strohm v. New York, L. E. & W. R. Co.*, 96 N. Y. 305, 306; *Chambers v. Chicago City Ry. Co.*, 175 Ill. App. 362; *Amann v. Chicago Consol. Traction Co.*, 243 Ill. 263, 267. For an expert witness to express an opinion that a certain condition "is very likely" to develop was held speculative and improper in the *Strohm* and *Chambers* cases, *supra*. In the *Amann* case, *supra*, it is said: "A mere possibility, or even a reasonable probability, that future pain or suffering may be caused by an injury, or that some disability may result therefrom, is not sufficient to warrant an assessment of damages." The effect of the erroneous admission of the testimony in the present case was greatly emphasized by the remarks of plaintiff's counsel to the jury and was, we think, prejudicial to defendant. We cannot tell what that effect was with reference to the amount of the verdict, as it is not susceptible of computation. (*Lauth* and *Lyons* cases, *supra*.) And, "whenever error is shown to exist it will compel a reversal unless the record affirmatively shows that the error was not prejudicial." (*Crane Co. v. Hogan*, 228 Ill. 338, 340; *Kirby v. People*, 123 Ill. 436, 439.) The present record does not so show.

Other grounds for reversal are urged by counsel for defendant, but it is unnecessary to consider them.

For the reasons indicated we feel constrained to reverse the judgment and remand the cause, and it is so ordered.

*Reversed and remanded.*