Elizabeth B. Bowman, as Conservator of Person and Estate of Charles Dale Bowman, Appellee, v. Illinois Central Railroad Company, Appellant.

Gen. No. 46,705.

First District, First Division.
March 5, 1956.
Released for publication March 21, 1956.

183

184

185

186

187

Floyd E. Thompson, Herbert J. Deany, Robert S. Kirby, Charles J. O'Laughlin, and Joseph H. Wright, of Chicago, for defendant-appellant; Joseph H. Wright, and Johnston, Thompson, Raymond & Mayer, all of Chicago, of counsel.

James A. Dooley, of Chicago, for plaintiff-appellee.

JUDGE NIEMEYER delivered the opinion of the court.

Defendant appeals from a judgment for $200,000 entered in plaintiff's action under the Federal Employers' Liability Act (45 U. S. C. A., sec. 51) for injuries sustained by her ward and son, Charles Dale Bowman (hereinafter called Bowman), a locomotive fireman employed by defendant, in jumping from a moving engine just before it collided with the caboose of a standing train. He was thrown against a cement milepost and suffered several broken ribs and a severe head injury. The defendant does not question on appeal its original liability for these injuries. The extent and effect of the head injury and the validity of a release executed by Bowman four months after the accident are the major matters in controversy.

The accident occurred on Saturday, May 22, 1948, near Olney, Illinois. Bowman was taken to the Olney Sanitarium for treatment. He was unconscious and remained in that condition until the fourth day when Dr. Lawrence F. Weber, the physician in charge, had his first conversation with him. On the following Sunday H. J. Hasch, an attorney practicing in Mattoon who had previously represented Bowman and later represented him in the settlement with defendant, visited him. Bowman's speech was rather halting and

188

his memory was not too clear. Hasch saw him again during the week. He was greatly improved and talked more fluently. Gilbert Edward Tenison, Bowman's engineer and a witness for plaintiff, visited Bowman a week or ten days after the accident. Bowman talked with Tenison and seemed normal.

Plaintiff says in her brief that on May 29th Bowman answered questions intelligently, and on June 15th he carried on a fair conversation with an aphasia, or a hunting for words. The plaintiff, Niza Sims, her daughter and sister of Bowman, Emily Foster, his niece, and Bonnie Alexander, a friend of the family, were at the hospital on three Sundays. Each testified that Bowman did not recognize them on any occasion. Plaintiff testified that he did not talk, he muttered.

On June 23, 1948, Dr. Weber, a witness for plaintiff, reported to defendant that Bowman had not fully recovered; that prognosis as to complete recovery to normal was questionable; that in his, the doctor's, opinion the progress toward recovery had been satisfactory, but he believed it advisable for Bowman to have a thorough neurological examination to evaluate more accurately the cerebral nervous system damage (the hospital was not equipped to do that examination).

June 28th Bowman was transferred to the Illinois Central Hospital in Chicago. He left the Olney Sanitarium in an ambulance. At the request of defendant he saw Dr. Eric Oldberg, who specializes in neurology and neurological surgery. The doctor, testifying as a witness for plaintiff, said that he saw Bowman at his office in Chicago on June 30th. He did not examine him. He reported to defendant that Bowman was improving rapidly and wished to be discharged to recuperate at his home; that he, Dr. Oldberg, saw no objection to this; that he felt Bowman had not returned to his normal mental state and did not believe any

189

final opinion regarding disability should be rendered at that time; that he should see Bowman approximately three months after the date of the injury.

Bowman was married July 3rd. The marriage caused a break in his family relations. His Pontiac automobile and his clothes were in the possession of plaintiff. Bowman went to his sister's home when plaintiff was there and asked for his car. Plaintiff testified that she did not let him have the car because he was in such bad health. She admitted that on a pre-trial deposition she had testified that she would not let him take the car because she was not certain they were married. She further testified on the trial that she turned over the keys of the car to the deputy sheriff the next day; that the deputy came later for Bowman's clothes; that for seven months thereafter she would just see Bowman on the street; he came home about February 1949; she, plaintiff, finally let his wife come to her home about three times. Niza Sims, Bowman's sister, testified that the first conversation she had with Bowman after he left the hospital was at the trailer where he was living with his wife in February 1949; that his wife was not the type of person that she would associate with; she, the witness, did not know that she had ever spoken to her; she, the wife, kept Bowman away from everybody.

Bowman was a few days late in his payments on the Pontiac. He went to James H. Ray, Sr., the district manager of the Chicago Motor Club at Mattoon, who had financed the purchase of the Pontiac and issued insurance on it, and told him that his, Bowman's, mother had locked up the car; he asked Ray what he could do to assist him in repossessing it. Ray told him to get a court order. After talking to Seibert, local claim agent for defendant, Bowman was introduced to Jack Horsley, a member of Craig & Craig, local attorneys for defendant, on July 6th. Horsley

instituted a replevin suit against plaintiff and re-covered the automobile and clothes.

On August 25th Seibert accompanied Bowman to Chicago where Bowman again saw Dr. Oldberg. The doctor did not examine Bowman. He testified that in cases of head injury a hospital examination would be necessary for him to reach a definitive opinion. Seibert talked with Bowman about going to the hospital, but Bowman would not go. On this trip to Chicago Bowman talked with Dr. Chester C. Guy, who testified for plaintiff. He was examined by Dr. John J. Madden, a witness for defendant.

Dr. Guy, chief of surgery at the Illinois Central Hospital three years at the time of the trial, had been connected with the hospital for about 27 years. He testified that he did not examine Bowman; he inter-viewed him August 25, and the records show that he saw him July 1st; that from his observation of Bow-man and from what Bowman told him, he noted on his record that Bowman was a psychiatric problem and recommended July 1st that he be discharged to his home under the further observation of the local rail-road doctors (Drs. Link and Zinschlag, conducting the Link Clinic); that Bowman did not want to stay in the hospital.

Dr. Madden's specialty is neurology and psychiatry. Having no independent recollection of examining Bow-man, he testified from his report to defendant that he made a tentative diagnosis of a post concussion syn-drone of moderate degree which will probably not permanently disable him. (The court struck the word "probably," leaving the rest of the statement stand-ing.) The doctor further testified that it was his ten-tative opinion that Bowman would make an almost complete recovery within a period of approximately six months; that it is extremely difficult to predict the future in such head injuries as Bowman had, and that

191

in his daily practice he wanted to know the history of the patient prior to the accident and to observe him on more than one occasion.

In the latter part of August Bowman and his wife came to the home of Marcus Glenn Stevens, chairman of the local grievance committee of the Brotherhood of Locomotive Firemen and Enginemen Railroad Union, part of whose duties was the settlement of personal injury claims of union members when they requested his help. Bowman told Stevens that he wanted to make a settlement. They talked about 15 or 20 minutes. Stevens saw him at least three or four times after that. Stevens made an appointment with Dr. Link, and Bowman and his wife went with Stevens to keep the appointment. After talking with Dr. Link, Stevens made an appointment for Bowman and himself in Seibert's office Monday, September 13. When Stevens got to Seibert's office Bowman was there with Hasch, his attorney. Stevens left. Hasch, a witness for defendant, testified that Bowman came to him the early part of September and said he believed he could get a settlement and wanted Hasch to help. Bowman, Hasch and Seibert discussed a settlement, but no agreement was arrived at. Hasch and Bowman then took a long ride. (The court refused to permit Hasch to tell his conversation with Bowman.) They tentatively arrived at a figure of $15,000. Bowman asked what Hasch's fee would be and was told $2,000. The next Friday, the 17th, they went to Seibert's office and submitted the figure. Seibert called Chicago and received authority to settle. Hasch and Bowman then said they wanted to talk about it further and would be back the next morning. About 9 o'clock Saturday morning, September 18th, they returned to Seibert's office and stated they had decided to make the settlement. Seibert prepared a release and a resignation of Bowman as an employee of defendant and wrote a draft for $14,730, the Railroad Retirement Board

having served a lien for $270. Seibert said he would have to have witnesses to the release and suggested that they go to one of the banks. Bowman selected the Central National Bank. Mrs. Lucille Bowman, who had been with the bank 32 or 33 years and was cashier of the bank when the case was tried, was related to Bowman by marriage. Seibert called Horsley, who made arrangements for the use of a conference room at the bank for witnesses, and a notary public.

Present at the bank during all or part of the time were Bowman, Hasch, Seibert, Irma Wetzel (now Mrs. William Kidwell) and Myrtle Swain, employees of the bank who acted as witnesses, Betty Armentrout, an employee of Craig & Craig, who acted as notary public, Horsley and A. D. Williams, then vice-president, now president of the bank. Seibert stated the purpose of the meeting, handed the papers to Hasch, who read them and told Bowman they were proper papers and handed them to him. Bowman read the release. Seibert asked if he understood it was a full settlement of all claims, and Bowman said yes. Seibert then asked him to write in the body of the release that he had read it and understood it. Bowman wrote as requested. No one told him how to spell. The papers were then signed by the parties, the witnesses and the notary public. The draft, payable to Bowman and Hasch, was delivered to them and endorsed. Bowman asked for $2,730 in cash and deposited the remaining $12,000. He counted out $2,000 to Hasch in payment for his fee, and $75 to Horsley for his services in the replevin suit.

Within a few weeks Bowman paid the balance due on the Pontiac automobile, paid a garage bill of $200 and bought a new Hudson car, paying $1,530 in cash and receiving credit for $1,230.61 on the Pontiac. In December 1948 he bought a trailer for $3,800, and after several months, being dissatisfied because it did not have a bathroom, he bought a second, more modern

trailer, receiving full credit for the amount paid for the first trailer. January 3, 1949 he sold a Philco refrigerator for $200, receiving cash, executing a bill of sale and signing a receipt.

April 28, 1949 Bowman entered the neurosurgical clinic of the Washington University Hospital in St. Louis, Mo. He was examined for treatment on that day and again on May 3rd by Dr. Gerald L. Winokur, a neurosurgeon called as a witness by defendant. He testified to the history given by Bowman, including an account of his injury, his gradual and steady improvement to the time of the examination, with residuals of weakness of the right arm and leg, some difficulty in speech and inability to see out of the right side of his eye. The doctor found definite evidence of brain damage but no abnormality in so far as his thought processes were concerned. He discharged Bowman after the second examination with no neurological treatment—none was indicated. In his opinion Bowman was fully competent, alert and rational at the time of his examination.

July 8, 1949 Bowman was committed to the Veterans' Facility Hospital, Danville, Ill., on a finding of traumatic psychosis, as a person in need of mental treatment. In October 1949 plaintiff was appointed conservatrix of his estate and person. November 6, 1950 this suit was started. Defendant answered, denying the negligence charged and the injuries alleged. It also filed a special defense, setting up the release as a bar to the action. Plaintiff replied, alleging that on September 18, 1948, when the purported release was entered into, Bowman was mentally incompetent to enter into any contract of any kind or character and did not know the nature of the so-called release, and could not know the nature of it; that defendant knew of the mental incapacity and incompetency of Bowman to enter into a contract, but its agent, H. G. Seibert,

194

who was well aware of this condition, nevertheless obtained Bowman's signature to the "so-called release."

Defendant moved for judgment on the pleadings because plaintiff had not tendered or offered restitution of the $14,730 received by Bowman, or any part thereof, and in the alternative, in the event its motion for judgment was denied, defendant moved for a separate trial on the issue of the validity of the release. Both motions were denied. On the trial defendant moved for a directed verdict on the issue raised by the special defense at the close of plaintiff's evidence, and again at the close of all the evidence. These motions were denied.

The court submitted to the jury, at the request of defendant, the following interrogatory:

"Do you find by a preponderance of the evidence that at the time plaintiff's ward executed the release he was incapable of understanding what he was doing and unable to comprehend the terms and effect of the release?"

The jury answered "yes," and returned a verdict for plaintiff, assessing his damages at $200,000. Judgment was entered on the verdict. Defendant moved for judgment notwithstanding the verdict, and in the alternative for a new trial. Among the grounds assigned for a new trial were,

"37. The jury's finding on the given special interrogatory demonstrates that the jury disregarded and ignored the manifest weight of the evidence.

"38. The jury's finding on the special given interrogatory demonstrates that the verdict should be set aside."

These motions were denied.

■ Before filing her brief plaintiff moved to strike that part of defendant's brief wherein it contends "The finding of the jury that Bowman did not understand

the nature of the release is contrary to the manifest weight of the evidence," and wherein it contends "that the award of $200,000 is 'grossly excessive,'" assigning as reasons therefor that defendant did not preserve its objection to the special finding, and that the contention that the verdict is "grossly excessive" is not open for consideration in this court. This motion was taken with the case. By it plaintiff seeks a piecemeal determination of the objections raised by defendant on appeal. If the court should entertain the motion, there is no reason why similar motions could not be filed as to each contention made by the defendant, thereby unnecessarily increasing the work of the court and denying defendant the right of oral argument on each contention which plaintiff moved to strike. The portions of the brief complained of are not scandalous or impertinent. They do not violate any rule of the court. We know no other grounds for striking a brief or any part thereof. The motion is denied.

In support of its contention that the release is a bar to plaintiff's action, defendant argues that restitution of the consideration received by Bowman is a condition precedent to rescission, and that the finding of the jury that Bowman did not understand the nature and effect of the release is contrary to the manifest weight of the evidence. By her reply to the special defense plaintiff narrows the grounds for rescission of the release. There is no allegation of fraud in the execution of or inducement to the contract, except the implication of fraud in dealing with Bowman, knowing his mental incapacity. Helbreg v. Schumann, 150 Ill. 12, 25–26; Clay v. Hammond, 199 Ill. 370, 377. The question raised is whether Bowman's incompetency and defendant's knowledge of it authorize rescission of the release without return of the consideration.

██ The validity of the release is to be determined by federal rather than state law, for "only if federal

law controls can the federal Act be given that uniform application throughout the country essential to effectuate its purposes." Dice v. Akron, C. & Y. R. Co., 342 U. S. 359, 361. Defendant insists that "the releases of railroad employees stand on the same basis as the releases of others" (Callen v. Pennsylvania R. Co., 332 U. S. 625, 630), and that, except in cases where the release is attacked for fraud in its execution, return of the consideration paid for the release is a condition precedent to rescission. It insists further, on authority of Callen v. Pennsylvania R. Co. (pages 630–1), that section 5 of the Federal Employers' Liability Act (45 U. S. C. A., sec. 55), which provides that "Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void . . .," does not apply to the settlement and compromise of claims arising under the act.

██ A judicial opinion must be read as applicable only to the facts involved, and is an authority only for what is actually decided. City of Geneseo v. Illinois Northern Utilities Co., 378 Ill. 506, 519; Cohens v. Virginia, 6 Wheat. (U. S.) 264, 399. In the Callen case no charges of fraud in procuring the release were involved. The sole ground for setting it aside was the mutual mistake of the parties as to the permanency of plaintiff's injuries. The return of the consideration paid ($250) as a condition precedent to plaintiff's rescission of the release was not involved and was not decided. The statement in the opinion that a release "is not a device to exempt from liability" under section 5, was made in reference to the release before the court—a release untainted by fraud. In the instant case plaintiff charges that Bowman was mentally incompetent, and that defendant, knowing such incompetency, obtained his signature to the release. A release

197

thus obtained before adjudication is voidable. (Ill. Rev. Stats. 1955, chap. 3, sec. 278.) Moreover, as hereinbefore stated, it is presumptively fraudulent. Defendant insists upon the return of the consideration of $15,000 as a condition precedent to plaintiff's right to attack the agreement as a bar to her action. If defendant's position is correct the employer will in most cases be exempt from liability no matter how meritorious the employee's claim, because the latter will, because of straitened circumstances, be unable to return the consideration which the employer has knowingly placed in the hands of an incompetent.

Section 5 was enacted to prevent this injustice. Duncan v. Thompson, 315 U. S. 1, establishes the application of the section to the situation presented here. Duncan, an employee having a right of action under the Federal Employers' Liability Act, entered into a contract under which in consideration of the payment of $600 to him he agreed in good faith to adjust and settle his case without litigation, and that if the claim was not so adjusted and he elected to bring suit, he would first return the $600, and that its return should be a prerequisite to the filing of any suit. He instituted suit. The trial court refused to make the return of the money a condition precedent to the suit and instructed the jury to credit the $600 on any verdict awarded Duncan. The Supreme Court, in upholding Duncan's right to sue without returning the money, held that the language of section 5 includes agreements after the event of the injury, and said (p. 7):

"The instrument prepared by the respondent for Duncan's signature purported to create a condition precedent to his bringing suit, the refunding of $600. By its terms, unless this condition were satisfied—and in view of Duncan's straitened circumstances the probability of satisfaction would seem negligible—Duncan's only means of enforcing such liabilities as should have

been assumed by the respondent would be taken from him. Hence the agreement, if valid, would effectively exempt the respondent from liability under the act, no matter what the merits of Duncan's claim."

In Irish v. Central Vermont Ry., Inc., 164 F.2d 837, where plaintiff sought to avoid a release alleged to have been signed by him in reliance on the fraudulent representation of defendant's claim agent to try to get plaintiff a pension, the court said (p. 840):

"If he must as a condition precedent to maintaining suit return what he was deceived into taking, he is as effectively deprived of his right to sue except upon that condition as though he had expressly so agreed, as did the employee in the Duncan case, supra. If this be so, what cannot be done by a fair agreement would follow by implication of law as the result of a fraudulent one, provided only that the latter is couched in terms of full and complete compromise. We leave undecided the effect of Sec. 5 as to a bona fide compromise and settlement. But we do hold that, if this release were obtained fraudulently by the appellee, it was within the broad scope of the phrase 'any . . . device whatsoever,' in Sec. 5 and consequently void. It follows that the plaintiff was free to attack its validity without restitution. Duncan v. Thompson, supra."

■ Upon the facts pleaded by plaintiff she was not required to return or tender the consideration paid Bowman as a condition precedent to attacking the release.

■ Plaintiff raises two objections to the right of this court to determine whether the answer to the special interrogatory and the verdict are against the manifest weight of the evidence. She first contends in her brief that sub-paragraphs 37 and 38 of defendant's motion for a new trial, hereinbefore quoted, are not

199

specific enough to preserve the objection. These sub-paragraphs specifically point out that the answer to the interrogatory disregards and ignores the manifest weight of the evidence. Under the decision in Midden v. Allstate Ins. Co., 7 Ill.App.2d 499, p. 508, this is sufficient.

Plaintiff next contends that the Appellate Court cannot weigh the evidence in actions under the Federal Employers' Liability Act to determine whether a verdict is against the manifest weight of the evidence. This contention is based on the reversal of Harsh v. Illinois Terminal R. Co. [351 Ill. App. 272] by the United States Supreme Court. 348 U. S. 940. This suit was instituted in the Circuit Court of Madison county, Illinois by alleging a violation of the Federal Boiler Inspection Act. (45 U. S. C. A., secs. 22–34.) There was a judgment for plaintiff. The Appellate Court held that the plaintiff's evidence required submission of the case to the jury, but that certain undisputed facts made the finding of the jury clearly against the weight of the evidence. The judgment was reversed and the cause remanded for a new trial. On petition for rehearing plaintiff contested for the first time the power of the court to consider and weigh the evidence in actions under the Federal Employers' Liability Act and to reverse a judgment and remand the cause as against the manifest weight of the evidence, and cited three United States Supreme Court decisions, including Lavender v. Kurn, 327 U. S. 645, and two Illinois cases. These cases dealt with questions of directed verdicts and judgments notwithstanding the verdicts, and not with reversals and remandments on the ground that the verdicts were against the manifest weight of the evidence. The petition for rehearing was denied and the Illinois Supreme Court denied leave to appeal. On review by the Supreme Court of the United States the judgment was

reversed, the per curiam opinion reading: "Judgment reversed. Lavender v. Kurn, 327 U. S. 645."

The case of Lavender v. Kurn was an action under the Federal Employers' Liability Act brought in a Missouri state court. The judgment for plaintiff was reversed by the Supreme Court of that state without remandment. The Missouri Court held that "plaintiff failed to make a submissible case . . . ." The Supreme Court of the United States said (p. 652):

"We hold, however, that there was sufficient evidence of negligence on the part of both the Frisco trustees and the Illinois Central to justify the submission of the case to the jury and to require appellate courts to abide by the verdict rendered by the jury."

The opinion must be read as applicable only to the facts involved and regarded as authority only for what was actually decided. The right of a reviewing court to reverse a judgment and remand a cause on the ground the verdict was against the manifest weight of the evidence was not before the court. The decision is not authority on that question. We cannot accept the reversal of the Harsh case, without explanation, as a decision against the right of an Appellate State Court to review the evidence in accordance with the uniform state practice. In Neese, Adm., v. Southern Ry. Co. (October Term 1955) 350 U. S. 77, the court expressly abstained from passing upon the right of the reviewing court to consider the question of excessive damages and decided the case on the ground that the evidence did not warrant the Court of Appeals in disturbing the action of the trial court.

■■ The case of Stott v. Thompson, 294 Ill. App. 450, cited by plaintiff, is not now an authority supporting her position. The holding in that case that the question of excessive damages was not for the consideration of the state courts of review, was expressly disaffirmed by the same court (Illinois Appellate Court

201

for the Fourth District) in Avance v. Thompson, 320 Ill. App. 406, 418–419 (1943), reversed on other grounds, and erroneously cited by plaintiff in support of her contention that the Appellate Court cannot examine the evidence as to the excessiveness of the verdict. Mr. Justice Stone wrote the opinion in both cases. In the later case, speaking for the court, he said:

"In the case of Stott v. Thompson, 294 Ill. App. 450, this court held that the question of the amount of damages awarded by the jury, in cases arising under the Federal Employers' Liability Act, is not for the consideration of the State courts, upon appeal. Upon a further consideration of this question, *it seems the better practice to consider the question of the excessiveness of the damages in this court.* In cases arising under the Federal Employers' Liability Act all procedural matters, including the admissibility of evidence, are governed by the law of the forum, Central Vermont Ry. v. White, 238 U. S. 507; Brinkmeier v. Missouri P. Ry. Co., 224 U. S. 268; Chesapeake & O. R. Co. v. De Atley, 241 U. S. 310; Chesapeake & O. R. Co. v. Kelly, 241 U. S. 485; Minneapolis & St. L. R. Co. v. Bombolis, 241 U. S. 211. *We will therefore consider the claim of defendant that the damages awarded by the jury, and the judgment of the trial court was excessive."* (Emphasis added.)

The remandment of a case for a new trial, unlike reversal without remandment, does not take away the right of the parties to a jury trial as it existed in the beginning. Sinopoli v. Chicago Rys. Co., 316 Ill. 609, 620. It is a matter of procedure, and so long as it is uniform in all cases it is not a federal question. Missouri ex rel. Southern Ry. Co. v. Mayfield, 340 U. S. 1, 3–5; Minneapolis & St. L. R. Co. v. Bombolis, 241 U. S. 211, 220–223; Central Vermont Ry. Co. v. White, Admr., 238 U. S. 507. Under the Illinois law it is the

202

duty of the Appellate Courts to reverse judgments and remand causes if the verdicts and judgments are against the manifest weight of the evidence. As said in Eilers v. Chicago Transit Authority, 2 Ill.App.2d 233, at page 236:

"The question presented is whether the verdict and judgment are against the manifest weight of the evidence. That it was the duty of the trial court to grant a new trial if the verdict was contrary to the preponderance of the evidence and the duty of this court to reverse it if it is against the manifest weight of the evidence are well established propositions of law. Indeed, these duties of the courts are as much a part of the jury system as the duty of the jury to reach a verdict without bias or prejudice. No trial court has a right to shirk its duty in this respect, nor has the Appellate Court a right to disregard it."

██ ██ The standard to be applied in testing Bowman's competency to execute the release is stated in Sharkey v. Sisson, 310 Ill. 98, where the validity of a deed was attacked. The court said (pages 112–113):

"The test of mental capacity to make a deed is that the grantor must have sufficient mind and memory to comprehend the nature and effect of his act. . . . The mind may be impaired incident to old age and disease, but if the grantor is able to understand the nature and effect of the business he is engaged in and is exercising his own will his acts are not invalid. (Essary v. Marvel, 274 Ill. 576; Kelly v. Nusbaum, 244 Ill. 158; McLaughlin v. McLaughlin, 241 Ill. 366.)"

The test refers to the time of the transaction. Flanigon v. Smith, 337 Ill. 572, 582. Proof of the mental condition for a reasonable time before or after the execution of the instrument attacked can be received only when it will tend to show such condition at the time of the transaction involved. Lewis v. Deamude, 376 Ill.

219, 221; Milne v. McFadden, 385 Ill. 11. The burden of proof was on plaintiff to show Bowman was mentally incompetent. Campbell v. Freeman, 296 Ill. 536, 539; Callen v. Pennsylvania R. Co., 332 U. S. 625, supra.

To support her charge plaintiff called nine lay witnesses, including herself, who testified to their observation of Bowman in the summer and fall of 1948. Four of these witnesses—plaintiff, Niza Sims her daughter, Bonnie Alexander, a long-time friend of the family, and Vernon Branson, a retired police officer—expressed no opinion as to Bowman's competence. Objections were made to the giving of opinions by McCoy, Mrs. Foster, Bowman's niece, Horn and Hilton. Defendant contends that the testimony of none of the witnesses for plaintiff is entitled to any weight.

Don H. McCoy operated a drive-in restaurant in Mattoon from September 1947 to March 1949. He knew Bowman approximately 28 years. During the summer of 1948 Bowman would come into the drive-in and eat. He had a wild expression in his eyes and gave incoherent answers to questions. Over objection McCoy testified that in his opinion Bowman was unable to transact any business during the summer of 1948 and continuously until March 1949. On cross-examination he testified that at times Bowman did not have money with him and promised to pay the next day; that he always paid the correct amount; that he, the witness, did business with him.

Emily Foster, Bowman's niece, testified that after Bowman left the Olney Sanitarium she next saw him about July 1, 1948 when he came to her mother's home for the keys to his car. He had a glazed or glassy look and his speech was incoherent. During the summer she saw him only when she ran into him on the street, and one time he didn't recognize her until she told him who she was. Over objection she testified that Bowman was definitely not capable of entering into business transactions.

Ed Horn, captain of police in Mattoon in December 1948, testified that at 12:27 a. m., December 14th, he talked to Bowman about 20 minutes in his trailer in Mattoon. Bowman said his wife had left him and he wanted the police to locate her. He described his wife and told where he thought she might be. He had a stary look, his eyes were glassy and in his talk he would repeat himself and would not get off the subject about his wife. Horn testified over objection that at the time he thought Bowman was very incompetent. On redirect examination he testified that he never knew Bowman to be abnormal mentally in any way.

Marvin Hilton, a former intercity bus driver, knew Bowman before his accident—not personally but they talked. He testified that the first time Bowman got on his bus in 1948 after the accident he had a disturbed look and the driver thought he might be drinking. He caused no trouble at any time on the bus. The unusual things the witness noticed were his look and the way he handled himself—practically useless, mostly on the right side. He did not have a long conversation with Bowman. He testified over objection that based on his observation of Bowman and his conversation with him he would say Bowman was mentally ill, very much so.

Clark Brady, a farmer and former client of one of plaintiff's attorneys in the trial court, testified in rebuttal that he knew Bowman since Bowman became a tenant in July 1948 in his, the witness' farm building, converted into flats in a rural area southeast of Mattoon. Over objection he was permitted to testify that he talked with Mrs. Bowman about Bowman's mental condition, without detailing the conversation, when they came to rent the flat. He testified that he noticed Bowman was very nervous, his eyes shifted and his conversation was chipped. You could hardly understand him when he moved in, but he got a little better after he was out there two or three months. Bowman did not discuss any single subject in an intelligent

205

manner throughout the time the witness knew him. In his opinion Bowman was not capable of entering into a business transaction. The longest conversation the witness had with him was five or ten minutes.

Vernon Branson, a retired police officer, testified that after the accident Bowman was kind of stary-eyed and once or twice he thought Bowman didn't know him in the summer and fall of 1948. In talking he would start on one thing and run off to something else. Bowman would laugh out loud without apparent cause and run off at the mouth. Between July 1948 and Bowman's adjudication (as a person in need of mental treatment) in July 1949 the witness noticed nothing unusual about his behavior. He was not asked to give his opinion.

The remaining witnesses, who were not asked to express an opinion, are family witnesses. Plaintiff, Niza Sims her daughter, and Bonnie Alexander, a friend of the family for many years, testified that Bowman had a stary look, difficulty in speech, incoherent conversation and failure to recognize them. They had no contact with Bowman, except as they saw him on the street, from the time he came for the keys to the car in early July until February 1949. It does not appear that they discussed business matters or had any extended conversations with him.

The basis for the introduction of an opinion of a nonexpert witness as to the mental unsoundness of a testator, grantor or, in this case, a releaser of a claim, has long been established and frequently stated. In Teter v. Spooner, 279 Ill. 39, 45, a will contest, the court said:

"The opinion of a non-expert witness that a testator is not of sound mind and memory is entitled to no weight where he states no facts or circumstances which could induce a reasonable belief of unsoundness of mind. *Before giving such opinion he must detail the*

206

*facts and circumstances upon which he bases his opinion.* Brainard v. Brainard, 259 Ill. 613." (Emphasis added.)

This is because "It is a province of witnesses in a case of this kind to give the jury the facts within their knowledge, and it is the province of the jury to form an opinion as to the inferences to be drawn from these facts." See also Hettick v. Searcy, 278 Ill. 116, 121, and Milne v. McFadden, 385 Ill. 11, 13. Tested by these rules the foregoing testimony of witnesses expressing an opinion that Bowman was mentally incompetent to transact business is entitled to no weight. McCoy says Bowman gave incoherent answers to questions; Mrs. Foster, that his speech was incoherent. Neither gave any details of conversations or any facts from which they reached the conclusion of incoherency to which they testified. The jury was left without any facts by which to weigh their testimony. For the same reason the testimony of Clark Brady is without weight. Horn based his opinion on Bowman's actions on the night his wife left him. His agitation on that occasion affords no reasonable basis for an opinion as to his capacity three months earlier to understand the nature and effect of a transaction concluded after almost a month of negotiations during which he was consulting with his union representative or his lawyer. Moreover, Horn testified on redirect examination that he never knew Bowman to be abnormal mentally in any way. His testimony destroys itself. Hilton, the bus driver, did not disclose the subjects or details of his conversations with Bowman, none of which was long. He testified to a single incident of abnormal behavior when he thought that Bowman might be drinking. He does not testify, and there is no evidence, that Bowman had not been drinking. This testimony lacks probative value.

■ Plaintiff supplements the foregoing testimony with the opinion of Dr. Joshua Speigel, a neurosur-

geon, called as a medical expert by her. He examined Bowman November 10, 1953 at the request of plaintiff's attorney. In answer to a hypothetical question he said he did not believe Bowman could have been competent from July 1948 on. In speaking of the testimony of physicians, not medical experts, the Supreme Court said in McGregor v. Keun, 330 Ill. 106, 118:

"It has never been held in this State that the testimony of doctors upon the subject of mental capacity is entitled to any greater weight than that of laymen who are men of good common sense and judgment."

The testimony of an expert medical witness is put on a lower plane. As said in Opp v. Pryor, 294 Ill. 538, 545:

"That class of evidence, however, is generally discredited and regarded as the most unsatisfactory part of judicial administration. This is with good reason, because the expert is often the hired partisan and his opinion is a response to a pecuniary stimulus. . . . The field of medicine is not an exact science, and the expert being immune from penalties for perjury, his opinion is too often the natural and expected result of his employment."

Moreover, Speigel's opinion, formed on the basis of plaintiff's evidence, becomes worthless and misleading when considered in connection with undisputed facts of business transacted by Bowman, including the negotiation and settlement of his claim against defendant, the disposition of the proceeds of the settlement, the subsequent purchase of an automobile and two trailers, receiving the full price paid for the first trailer on the purchase of the second, hereinbefore described, and of other business transactions hereinafter referred to. Opinions yield to facts.

The deficiency in plaintiff's testimony is not aided by the testimony of Doctors Weber, Oldberg and Guy, hereinbefore stated. Neither witness testified to a fact

or circumstance indicating incapacity to transact business or expressed an opinion on the subject. Dr. Oldberg, the only neurosurgeon among them, refused to give a definite opinion as to the extent or permanency of Bowman's injury without hospital observation. Dr. Guy, without examination, merely described him as a psychiatric problem. Dr. Weber gave his attention to the treatment of Bowman's physical injuries while in the Olney Sanitarium and merely expressed an opinion that a neurological examination should be had.

 The order of July 8, 1949 committing Bowman to the Veterans' Facility Hospital at Danville, Illinois on a finding of traumatic psychosis as a person in need of mental treatment, is not evidence of mental illness or incompetency. (Ill. Rev. Stats. 1953, chap. 91½, sec. 5—11, par. 3.) The order of commitment of August 7, 1952, almost four years after the execution of the release, is too remote to be of any probative value. McGregor v. Keun, 330 Ill. 106, 116, supra.

In opposition to the insufficient evidence on plaintiff's behalf, defendant introduced the testimony of two physicians and seventeen lay witnesses. The testimony of Doctors Madden and Winokur need not be repeated. Dr. Madden, after an unsatisfactory and incomplete examination, gave a tentative opinion that Bowman would make an almost complete recovery within a period of approximately six months after August 1948. Dr. Winokur, testifying to the results of examinations of Bowman at the neurological clinic of the Washington University Hospital at St. Louis, Missouri within eight months after the settlement, made for the purpose of treating him, expressed an opinion that Bowman was fully competent, alert and rational at that time.

 The undisputed evidence shows that at all times during the negotiation and completion of the settlement with defendant Bowman was exercising his

own will. He initiated the settlement by talks with Stevens, the union representative, shortly after the middle of August, and actively participated in every step taken thereafter—selected the bank where the transaction was closed and disposed of the proceeds of the settlement in an intelligent and competent manner, paying $2,000 to Hasch for his services in the settlement, $75 to Horsley for instituting the replevin suit against his, Bowman's mother, and putting on deposit $12,000. The settlement was made when the full extent of Bowman's injury had not been ascertained by the doctors and before the great deterioration in Bowman's condition claimed by plaintiff, had manifested itself. It was made in Bowman's home town, a nonmetropolitan community, where, the courts take judicial notice, the awards by verdicts and judgments in personal injury actions are far below the amounts awarded in Cook county. The reasonableness of the transaction must be judged by the conditions at the time and place of the transaction and not by subsequent events or the more favorable conditions that could be presumed had the settlement been originally negotiated in Cook county. Seibert testified he had been settling cases in Mattoon and around Illinois for thirty-one years, and the Bowman settlement was one of the largest he ever made.

Stevens, who opened the negotiations for settlement with Seibert, and Hasch, Seibert and Horsley, who were present at the bank when the settlement was completed, had previously had business transactions with Bowman. Stevens, the union representative, had many contacts with Bowman since his employment by defendant in 1945. He had helped in the settlement of a minor personal injury claim of Bowman in the latter part of 1947. After discussing with Bowman, at his request, the settlement with defendant, he went with Bowman and his wife to talk with Dr. Link, to whom

Bowman had reported for observation, and, after the talk with Dr. Link, called Seibert, the claim agent, for an appointment. He dropped out of the negotiations when Bowman appeared with Hasch as his attorney.

Hasch had represented Bowman in an important matter in 1947, having been employed by Mrs. Sims, Bowman's sister, and in other matters. He had been employed to represent Bowman in handling his claim against the defendant while Bowman was a patient in the Olney Sanitarium. He had talked with Dr. Weber at Olney, and before the settlement had contacted Dr. Zinschlag, a local physician, at the request of Bowman. He had talked with Bowman professionally and socially since Bowman's accident.

Seibert had settled a minor personal injury claim of Bowman in 1947; had talked with him in the Olney Sanitarium and on his trips to Chicago where he saw Doctors Oldberg, Guy and Madden. On September 11, 1948 Seibert had Bowman examined by Dr. Link and received a favorable report, the sum and substance of which was that Bowman was mentally capable of transacting business. Dr. Link died before the trial.

Horsley, a practicing attorney and member of the firm of local attorneys representing defendant after suits were brought in personal injury matters, met Bowman in early July and instituted the replevin suit for Bowman's automobile and clothes. Each of these witnesses testified positively that in his opinion Bowman was mentally competent to transact business and that he knew the nature and effect of the transaction in which he was settling his claim against the defendant.

Williams, vice-president of the bank, first met Bowman on the morning of September 18, 1948 when the transaction between Bowman and defendant was closed. He was not paying any particular attention to Bowman so far as his mental condition was concerned;

211

he didn't notice anything of an abnormal nature—it was just a regular business transaction. Bowman endorsed defendant's draft, opened an account with the bank by depositing $12,000 and received $2,730 in cash. Bowman drew checks on the account and closed it out by check for the balance $8,960, payable to the National Bank of Mattoon, to which the account was transferred. William's conduct in handling the Bowman account is consistent only with belief in Bowman's competency. The two employees of the bank and the notary public in the office of Horsley each testified that in their opinion Bowman was competent to transact business.

James H. Ray, Sr., the district manager of the Chicago Motor Club, testified as hereinbefore mentioned to having financed Bowman's purchase of a 1941 Pontiac car and issuing insurance on it in February 1948, and of Bowman's request in early July, when back a few days in his payments, if Ray could do anything about getting his, Bowman's, car from his mother. Ray further testified that in October 1948 Bowman paid the full amount due on his Pontiac and later came in to inquire if his living in the trailer camp in Decatur would affect his insurance, and made the necessary adjustments to keep the insurance alive. This witness noticed nothing abnormal about Bowman in so far as his mind was concerned after the accident and was of the opinion that he was definitely mentally capable of entering into business transactions.

Hal C. Ross, a Hudson car dealer in Mattoon from 1945 to May 1950, sold Bowman a 1941 club coupe in 1946 and a secondhand Pontiac in February 1948; saw him in the garage at different times in August or September 1948 when Bowman told him of his accident, said he was back in Mattoon, feeling good, and would probably want another car. October 2, 1948 Bowman bought a new Hudson coupe, paying $1,530 by check

212

and being credited with $1,230.61 on his Pontiac car. Bowman also paid a garage bill of $200 by check. Ross testified that there was nothing abnormal about Bowman's conversation; that he, the witness, was able to have intelligent conversations with Bowman and understood what he was saying, and during that period Bowman was mentally capable of entering into business transactions.

Mrs. Dorothy Bennett, an operator of a trailer court and sales agency in 1948 and 1949, met Bowman and his wife in November or early December 1948. They came to look at house trailers on her lot. Bowman looked over the trailers to see the construction of the framework, came back three or four times. On these occasions they discussed the various trailers. The witness sold Bowman a trailer the early part of December and Bowman and his wife moved into it on the trailer lot. Bowman was dissatisfied because the trailer was nonmodern. He went to Decatur, where the principal office of the sales agency was located, to look at other trailers, and finally bought a second trailer, receiving as credit on the purchase price the full amount paid for the first trailer. On January 3rd Mrs. Bennett bought a ten-foot Philco refrigerator from Bowman, paying $200 cash and receiving a receipt signed by him. The Bowmans were on the trailer court from December 6, 1948 to May 6, 1949, Bowman paying the weekly rental regularly. During that time she did not notice anything abnormal so far as Bowman's mind was concerned. He was able to discuss intelligently the subjects they talked about. He understood and knew the nature of the transactions he had with her and was in her opinion mentally capable of transacting business.

Mrs. Estelle Gammill, a neighbor of the Bowmans at Clark Brady's place outside of Mattoon until the latter part of September or first part of October 1948, testified that she noticed nothing unusual about Bowman

213

so far as his mind or mentality was concerned; he did not have a blank or stary look; she saw him drive his Pontiac car, and he told her and her husband that he had settled his claim against the railroad shortly before they left; he watched the two or three-year-old baby of the Gammill's three or four times while the witness went to the store.

Edward H. Davidson, chief of police of Mattoon in 1948 and for more than a year an adjuster for an insurance company at the time of the trial, had known Bowman more than twenty years. In the fall of 1948 Bowman came to the witness' office and told him that his mother and sister were trying to get him declared incompetent so they could get his money; that he had settled with the railroad about three or four weeks prior to the conversation. The witness saw Bowman three or four times after that and they discussed Bowman's money problems; while he was chief of police no reports came to him that Bowman was following people around and sort of staggering about the streets of Mattoon. He noticed no difference in Bowman so far as his mind was concerned following the railroad accident. In his opinion Bowman was competent.

Other witnesses whose contacts with Bowman came through veterans' organizations and services testified to his ability to transact business. Clarence P. Miller, a New York Central trainman, knew Bowman since the latter part of 1948 or early part of 1949 through the American Legion. They worked together in putting a new kitchen in a large garage which the Legion had bought for a home. He noticed nothing abnormal so far as Bowman's mind was concerned; he did his work well, was able to carry on intelligent conversations, speak coherently, and what he said made sense to the witness. Bowman was initiated into the Forty and Eight Club in October 1951. It is an honorary degree for meritorious work with the Legion. He did not

notice any blank, staring or dreamy look in his eyes. In his opinion Bowman was competent to transact business.

William J. McKleroy, service officer for the Illinois Veterans' Commission, knew Bowman for approximately sixteen years. Bowman petitioned the Veterans of Foreign Wars in the latter part of 1948 and joined in January 1949 when the witness was commander. He saw Bowman quite frequently at the Veterans of Foreign Wars and around town for a period of about six months; had conversations with him and did not notice anything unusual or abnormal about him so far as his mind was concerned; he seemed no different to the witness from back sixteen years ago. Bowman filed several claims with the Illinois Veterans' Administration during the preceding four or five years.

Mrs. Ann Dykes first came in contact with Bowman in 1948 or 1949 when he came into a drive-in restaurant she owned. She did not notice anything abnormal about him so far as his conversation or mentality was concerned. She became secretary of the Illinois Veterans' Commission Office from March 29, 1951 to March 15, 1953 and there saw Bowman quite frequently as he made application for different benefits. She filled out applications for him, as she did for all applicants, as the questions are not too simple. She did not notice anything abnormal about him so far as his mind was concerned nor in the way he talked. He was mentally competent to answer questions that she asked him. He told her that he had made a settlement with the railroad for $15,000 and had $9,000 in bonds.

Joseph P. Smith, Jr., a young lawyer who came to Mattoon in July 1951, met Bowman at the American Legion Home shortly afterwards, and his contacts with Bowman were principally in seeing him at the American Legion. On several occasions he discussed personal matters with Bowman, but did not represent him

215

professionally as Bowman had a conservator. There was nothing abnormal or unusual about the way he talked. He was able to carry on an intelligent conversation and discussed various subjects. The witness believes he was capable of entering into business transactions.

 The mental competency of Bowman to execute the release of his claims against defendant on September 18, 1948 is established by the overwhelming weight of the evidence. There is no evidence that defendant believed him to be incompetent to contract. The trial court erred in denying a new trial. We reverse the judgment as against the manifest weight of the evidence and remand the cause for a new trial.

However, as the case must be tried again and as reversible error in other respects was committed by the court, we regretfully extend this opinion so that these matters may be discussed and possible error on a second trial averted.

Defendant contends that the court erroneously permitted the lay witnesses for plaintiff—McCoy, Mrs. Foster, Horn, Hilton and Brady—to state their opinions that Bowman was incompetent. The objection to the testimony of the first four witnesses was properly preserved, and for the reasons hereinbefore stated in discussing the weight of the opinions stated by these witnesses, the court erred in permitting them to testify. For the same reason the testimony of Brady was objectionable, but defendant failed to make a proper objection.

 Defendant argues that the court erroneously permitted Mrs. Foster, Bowman's niece, to testify that "at times he (Bowman) acts more childish than my daughter, who is eight," and that, when showing his new trailer "he was like a child with a new toy," and in permitting Mrs. Sims, Bowman's sister, to state that "he (Bowman) acts like a ten year old child." The

characterization of Bowman's conduct and its comparison with that of a child was erroneous. The witnesses should have stated facts and not conclusions so that the jury could properly evaluate the testimony and draw inferences from facts, not conclusions. Wallace v. Whitman, 201 Ill. 59, 67; Bohn v. Standard Laundry Co., 148 Ill. App. 494, 497. The first statement of Mrs. Foster was received without objection. Proper objection was made to the second statement, and a motion to strike the statement of Mrs. Sims preserved the objection to her statement. Similar expressions should be avoided on a second trial.

■ A more important matter is the objection of the defendant to the testimony of the witness Horn, captain of police, elicited on direct examination and not on cross-examination as contended by plaintiff, that he, the witness, received numerous reports that Bowman was disturbing people on the streets, creating a nuisance to them. Defendant objected to what the reports were and moved to strike the answer. The objection was overruled and the motion denied. The witness then stated that this happened ten or twelve times. On cross-examination he stated that he had no records of these complaints. He believed he had a report in September 1948, a complaint in January 1949 and in February, and that the rest of the incidents were in 1950 and 1951. He could not recall the names of any of the persons reporting to him or to the department.

■ The admission of this hearsay evidence—statements of unnamed persons—was plainly erroneous. Plaintiff makes no serious effort to sustain the ruling of the court, merely quoting an inapplicable statement from Morgan, Basic Problems of Evidence (Vol. 1, p. 217, et seq.), to the effect that when a trait of a person's character is a provable fact, proof of reputation as to that fact is admissible as tending to

217

prove the truth of the matter reputed. Plaintiff's principal answer is that defendant is in no position to complain because after the ruling of the court it elicited practically the same evidence on cross-examination, citing Porter v. Terminal R. Ass'n of St. L., 327 Ill. App. 645, and Wright v. Avery, 172 Ill. 313. Plaintiff's position is not tenable. Wright v. Avery is not applicable. It involved a motion for a directed verdict at the close of plaintiff's evidence, the court holding that "defendants waived their motion by introducing testimony on their behalf." In Porter v. Terminal R. Ass'n of St. L. the admission of a statement by plaintiff over objection was alleged to be error. No authorities were cited as to the competency or incompetency of the evidence, and the Appellate Court held that it was immaterial. However, the court stated that practically the same evidence was elicited on cross-examination by defendant and that the error, if any, was cured, citing but not quoting 4 C. J. 983. This is not the law in Illinois. In Teter v. Spooner, 279 Ill. 39, 46–47, the court said:

"It would, indeed be an extraordinary rule, after these questions had been asked on direct examination, to hold that counsel for the plaintiffs in error could not, on cross-examination, ask questions of a similar character without waiving objections previously made to the questions on the direct examination. Indeed, this court, after a review of the authorities in other jurisdictions, has held that after the court has overruled defendant's objections to a certain class of evidence the defendant may introduce evidence of the same class to meet that of the plaintiff without waiving his right to claim his exceptions on appeal. (Chicago City Ry. Co. v. Uhter, 212 Ill. 174, and cases there cited.) There can be no question that it was error to permit the asking and answering of these questions and that this

218

error was not waived by any questions or acts of counsel for plaintiffs in error."

See also City of West Frankfort v. A. C. Marsh Lodge No. 496, I. O. O. F., 315 Ill. 32, 35–36.

██ The court erroneously refused to receive in evidence eleven checks signed by Bowman within a month after the settlement of September 18, 1948, in payment of bills owed by him, personal property purchases, and in transferring his account to the Mattoon National Bank. Williams, vice-president of the bank on which the checks were drawn, and in whose presence Bowman had signed the signature card when opening the account, testified that each check bore Bowman's signature. These checks were cashed by the bank. Plaintiff says in her brief that "An examination of the checks will reveal that, other than his signing, they were written in a different hand, or in some instances typed," and adds: "The court properly ruled that his signature card was admissible, but not the check by bare proof of the signature." No authority is cited to support this contention. The checks were a part of defendant's evidence showing the transaction of business by Bowman, and no objection was made to their materiality. Practically all checks are now filled out as to date, name of payee and amount by someone other than the signer, or are typed. The check gets its validity from the signature, and no further proof is required in the absence of evidence on the face of change, erasure or other mutilation, matters not present here.

 One of the most serious errors of the court in ruling on evidence is its rejection of the testimony of Hasch as to his conversations with Bowman during the negotiations with Seibert. This testimony was competent and of vital importance on the question of Bowman's competency and his understanding of the

transaction. Wilkinson v. Service, 249 Ill. 146, 151. It also served as a foundation of Hasch's opinion as to Bowman's competency. Pederson v. Nixon, 284 Ill. 421, 428–429. Plaintiff, ignoring the reasons assigned by defendant for the admission of this testimony, and the authorities cited, erroneously treats the question as an effort to "inject something of settlement negotiations." This contention is wholly irrelevant. Plaintiff attempts to bar consideration of the question by insisting that defendant failed to preserve the record, since it failed to make an offer of proof. This technical escape is not available in this case. The purport of the question was plain and the answers asked for could only relate to the matters involved in the settlement and Bowman's understanding of them. An offer of proof was not necessary. As said in Creighton v. Elgin, 387 Ill. 592, 606:

"The court clearly erred in sustaining the objection. It is immaterial that the ruling was not followed by an offer of proof. It is not necessary that an offer of proof be made where the question shows the purpose and materiality of the evidence. It is not necessary that counsel state what the answer would be. If a question is in proper form and clearly admits of an answer relative to the issues, the party by whom the question is propounded is not bound to state facts proposed to be proved by the answer unless the court requires him to do so. Hartnett v. Boston Store of Chicago, 265 Ill. 331."

Another serious error of the trial court was in permitting Dr. Otto Berdach to testify over objection to subjective symptoms related to him by Bowman in an examination on September 9, 1951, ten months after this suit was instituted, and to base his diagnosis and answer to a hypothetical question, in part, on such symptoms. At the time of the examination the doctor was chief of the male admission service of the Jack-

220

sonville State Hospital. He testified that "We were just about to get around to see him (Bowman) when he was ready to leave. . . . I don't recall whether or not I gave him any treatment." It appears from the testimony of Dr. N. S. Zeitlin, a medical expert witness who testified for plaintiff and who preceded Dr. Berdach on the stand, that two days later, September 11, 1951, Bowman appeared in his, Zeitlin's, office in Chicago, where the doctor took X-rays of Bowman at the instance of plaintiff's counsel, which were used in the doctor's testimony as an expert.

 The rule permitting a physician to testify to subjective symptoms is limited to a treating physician, for the reason stated in Shell Oil Co. v. Industrial Comm., 2 Ill.2d 590, 602, where the court said:

"It is an exception to the hearsay rule, however, that declarations of an injured person to his treating physician as to his physical condition, and the cause thereof are admitted in evidence for the reason that it is presumed that a person will not falsify such statements to a physician from whom he expects and hopes to receive medical aid. (Shaughnessy v. Holt, 236 Ill. 485.)"

See Told v. Madison Bldg. Co., 216 Ill. App. 29, 49–50.

 While plaintiff does not contend that Dr. Berdach treated Bowman, she insists that "It is obvious the doctor did not examine Bowman for the purpose of testifying." The good faith or intent of the doctor is not involved. It is the demonstrated lack of good faith on Bowman's part and his intention not to remain for treatment that renders the testimony inadmissible. By this testimony Bowman was able to get before the jury his self-serving statements in furtherance of his pending suit, such as his denial that he had been married and his belief that some one substituted for him in the ceremony. Its admission is reversible error.

██ Edward H. Davidson, called by defendant as a nonexpert witness as to Bowman's mental competency, testified on direct examination that in the fall of 1948 Bowman told him that his, Bowman's, mother and sister were then trying to get him declared incompetent so they could get his money. On cross-examination plaintiff elicited the statement that the witness had told Kenneth Green, one of the plaintiff's attorneys, of Bowman's complaint. Green, called in rebuttal, denied Davidson's testimony on cross-examination. In cross-examining Davidson as to whether he had told anyone of Bowman's complaint plaintiff was cross-examining on a collateral matter and Davidson's answer was conclusive against her. It was not subject to impeachment. 1 Greenleaf on Evidence (15th ed.) sec. 449; Gifford-Wood Co. v. Western Fuel Co., 209 Ill. App. 357, 365; Girdzus v. Van Etten, 211 Ill. App. 524, 529. The motion to strike Green's testimony should have been allowed.

██ Defendant also complains of the cross-examination of its witness Hasch and the attempted impeachment of the witness by plaintiff in rebuttal as to his participation in plaintiff's appointment as conservator of Bowman in October 1949. We have carefully examined the testimony of Hasch and the rebuttal testimony of plaintiff. There is much in the cross-examination of Hasch that is objectionable. However, defendant failed to object and cannot now complain. As we do not believe that the errors will be repeated on a new trial we will not, because of the excessive length of this opinion, refer in detail to the objectionable matters. Error, if any, in the attempted impeachment of Hasch by plaintiff will undoubtedly not be repeated on a second trial if the rule hereinbefore applied to the attempted impeachment of the witness Davidson is followed.

██ ██ The court erred in requiring Seibert to testify over objection to the usual and customary fee

222

in a contingent case like the present. Hall v. Chicago & N. W. Ry. Co., 5 Ill.2d 135. However, similar testimony was elicited on the cross-examination of Hasch, without objection, and the error in Seibert's examination is negligible. Much of the examination of the witnesses Joseph H. Wright, vice-president and general counsel of defendant, and William M. Holwick, general claim agent of defendant, called as witnesses by plaintiff, was objectionable. But again, objection to such examination was not made. The examination in open court as to the records produced on subpoena and the implication of failure to produce all papers called for, was improper. Compliance with the subpoena was a matter only for the court, and whatever complaints in this respect plaintiff had should have been investigated by the court out of the presence of the jury.

We deem it unnecessary to consider the alleged errors in plaintiff's argument to the jury and in the court's action in refusing the instructions complained of, as these errors, if any, can be avoided on a second trial. We do not consider the question of the excessiveness of the damages awarded for a like reason.

■■■ Whether the issues in the main case and the issues raised by the special defense should be tried together, is a matter resting in the sound legal discretion of the trial court. However, the record proves the improbability, if not the impossibility, of a fair trial for defendant on the issues of the special defense so long as those issues are tried with the issues of the main case. All evidence pertinent to the mental condition of Bowman on September 18, 1948 is material in the main case as an element of damages. Only that evidence relating to his mental condition after that date which tends to establish his mental condition on September 18, 1948 is competent on the issues of the special defense. The answer of the jury to the special interrogatory, and the general verdict against the overwhelming preponderance of the evidence as to

223

Bowman's mental condition on September 18, 1948, show the prejudicial effect of the evidence as to the later condition of Bowman's mind, which is not competent on the issues of the special defense. We therefore suggest that the issues of the special defense and of the main case be tried separately.

Because the verdict and the answer to the special interrogatory are against the manifest weight of the evidence, and because of the errors of the court in rulings on evidence, the judgment is reversed and the cause remanded for a new trial.

Reversed and remanded.

FRIEND, P. J. and BURKE, J., concur.